586 F.2d 925
 78-2 USTC P 13,266
 ESTATE of Arthur K. WATSON, Ann Hemingway Watson, Helen W.
Buckner, Ann C. H. Watson and Jane W. Watson, as
Executrices of the Will of Arthur K.
Watson, Deceased, Appellees,
v.
W. Michael BLUMENTHAL, as Secretary of the Treasury, and
Hubert J. Hintgen, as Commissioner of the Bureau
of the Public Debt, Appellants.
 No. 9, Docket 78-6045.
 United States Court of Appeals,
Second Circuit.
 Argued Sept. 13, 1978.
Decided Oct. 30, 1978.
 
 Naomi Reice Buchwald, Asst. U.S. Atty., New York City (Robert B. Fiske, Jr., U.S. Atty., S. D. N. Y., William G. Ballaine and Louis G. Corsi, Asst. U.S. Attys., New York City, of counsel), for appellants.
 John R. Hupper, Cravath, Swaine & Moore, New York City (George J. Gillespie, III, Christine Beshar and Andrew D. Postal, New York City, of counsel), for appellees.
 Before OAKES, GURFEIN and MESKILL, Circuit Judges.
 OAKES, Circuit Judge:
 
 
 1
 This appeal, were there subject matter jurisdiction, would involve the very interesting, if not altogether novel, question of the extent of agents' authority under a general power of attorney after their principal becomes fatally comatose as the result of a serious accident. However, in this suit against the Secretary of the Treasury for declaratory and mandamus relief in connection with the redemption of certain United States Treasury bonds, commonly known as Flower Bonds, which plaintiffs seek to redeem at par for the payment of federal estate taxes due from decedent Arthur K. Watson's estate, we find a lack of subject matter jurisdiction in the district court. Accordingly, we reverse the judgment of the United States District Court for the Southern District of New York, Thomas P. Griesa, Judge, 442 F.Supp. 1000 (S.D.N.Y.1977), which held that the Flower Bonds purchased for Arthur Watson's estate after his fatal fall but before his death were the property of his estate and that redemption was accordingly required but did not discuss the jurisdictional aspects of the case other than to say that "(p)laintiffs are further entitled to a writ of mandamus directing defendants to so redeem and apply the bonds," Id. at 1003, citing our own Lovallo v. Froehlke, 468 F.2d 340 (2d Cir.), Cert. denied, 411 U.S. 918, 93 S.Ct. 1555, 36 L.Ed.2d 310 (1972).
 
 FACTS
 
 2
 On July 18, 1974, former Ambassador Arthur Watson fell down the stairs at his home in New Canaan, Connecticut, sustaining a laceration of the brain and fractured skull. No curative treatment was or could have been given to him; he remained comatose until his death eight days later. The day after the fall his brother and a member of the law firm of Cravath, Swaine & Moore, acting pursuant to a May 1, 1970, power of attorney, purchased $5 million worth of Treasury bonds, commonly called Flower Bonds, and three days later made a second bond purchase in the face amount of $3 million.
 
 
 3
 Treasury bonds in general and Flower Bonds in particular are issued under the authority given Congress in Article I, Section 8, Clause 2, of the Constitution "to borrow Money on the credit of the United States." Flower Bonds derive from the Second Liberty Bond Act, 31 U.S.C. § 752, and more particularly Section 20 of the Act, 31 U.S.C. § 754b, which was amended, 56 Stat. 189 (1942), so as to permit "under such regulations and upon such terms and conditions as the Commissioner of Internal Revenue with the approval of the Secretary of the Treasury may prescribe (bonds to) be receivable by the United States in payment of . . . taxes."[1] Regulations were adopted to permit certain bonds issues to be redeemed at par for purposes of paying federal estate tax. These issues are called Flower Bonds because in effect they bloom at the time of the death of the owner, prior to which, particularly because they bear low interest, they sell at a substantial discount on the open market. The Treasury Department could not issue Flower Bonds after March 3, 1971, because of a statutory repeal, 31 U.S.C. § 757c-4, but a number of issues made in the 1940s and '50s with maturity dates in the 1970s, '80s and '90s are outstanding, purchasable on the open market and ready to "bloom" upon the owner's death. In connection with each issue here involved,[2] the Treasury's Bureau of the Public Debt issued "offering circulars" that set forth the conditions for the redemption of the bonds. Although the language of each of the offering circulars varies somewhat, they all require ownership or actual ownership by the decedent at the time of his death. The circulars incorporate the regulations now appearing at 31 C.F.R. § 306.28, which also set forth, Subparagraph (b),[3] as the requirements for redemption of bonds under this section that (1) the decedent must have owned the bonds at the time of his death, and (2) the bonds must constitute a part of his estate.
 
 
 4
 Following Mr. Watson's death, his estate ratified the purchase by his attorneys-in-fact and tendered to the Bureau of the Public Debt, for application to federal estate tax due, bonds in the face amount of $4,742,000 for redemption at par and accrued interest in accordance with their terms. But the Bureau rejected the tender because it felt that under general rules of agency law, Mr. Watson's comatose condition at the time of the bond purchase vitiated the power of his attorneys-in-fact to act for him. The estate and the executrices thereof brought this suit against the Secretary of the Treasury and the Commissioner of the Bureau of Public Debt seeking declaratory relief and an order directing the Government to redeem the bonds at par and apply them with accrued interest in satisfaction of estate taxes due. Plaintiffs allege jurisdiction under 28 U.S.C. §§ 1331 (federal question), 1361 (mandamus), 1391(e) (relating to venue in civil actions against United States agencies or employees), and 2201 (Declaratory Judgment Act). Because § 1391(e) is, as indicated, a venue statute and does not in and of itself confer subject matter jurisdiction and § 2201 does not provide an independent basis for jurisdiction but simply increases the remedies available to a litigant, Skelly Oil Co. v. Phillips Petroleum Co., 339 U.S. 667, 70 S.Ct. 876, 94 L.Ed. 1194 (1950); Delavigne v. Delavigne, 530 F.2d 598 (4th Cir. 1976), we need not discuss those sections further.
 
 FEDERAL QUESTION JURISDICTION
 
 5
 Jurisdiction lies under § 1331,[4] since 1976[5] without regard to the amount in controversy, against the United States, any agency thereof, or any officer or employee thereof in his official capacity, if the action "arises under the Constitution, laws, or treaties of the United States." However, under Section 1 of the Tucker Act, 28 U.S.C. § 1491,[6] the Court of Claims has jurisdiction "to render judgment upon any claim against the United States founded either upon the Constitution, or any act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States." Under § 1346(a)(2), also a part of the Tucker Act, the district courts have original jurisdiction concurrent with the Court of Claims of actions similarly founded only if they do not exceed $10,000 in amount.[7] For contract actions against the United States the Court of Claims has exclusive jurisdiction for claims over $10,000. See International Engineering Co., Division of A-T-O, Inc. v. Richardson, 167 U.S.App.D.C. 396, 512 F.2d 573, 577 (1975), Cert. denied, 423 U.S. 1048, 96 S.Ct. 774, 46 L.Ed.2d 636 (1976); 17 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 4101, at 210 (hereinafter cited as Wright). Thus, simplistically viewed, our question in the first instance would be whether the present complaint is "founded upon" a contract, in which case only the Court of Claims would have jurisdiction because the amount in controversy far exceeds $10,000, or is one "arising under" an Act of Congress (the Second Liberty Bond Act) or a regulation of an executive department (the regulations above mentioned, 31 C.F.R. § 306.28) within the meaning of § 1331. The Government contends strongly for the contract position, the estate for what we may call the "arising under" position.
 
 
 6
 As so often occurs in such matters, the characterization of the claim as one founded upon a contract or arising under a law or regulation of the United States, although determinative of the outcome, is a question by no means simple of solution. Judge Gignoux has suggested in a similar case in the District of Maine that a plaintiff would have difficulty meeting the "arising under" requirement of § 1331 because the suit arises "primarily under a contract and not directly under the laws of the United States." Estate of Pingree v. Blumenthal, No. Civ-77-3-ND at n. 5 (D.Me. Mar. 3, 1978). As District Judge Albert Johnson said in United States v. Dauphin Deposit Trust Co., 50 F.Supp. 73, 76 (M.D.Pa.1943), in connection with savings bonds under the Second Liberty Bond Act, "(e)ach of said bonds, together with the Statutes, Treasury Regulations, and Circulars constitute a valid and binding contract determining the rights of the parties therein and . . . ownership and title to the said bonds are controlled by Section 22 of the Second Liberty Bond Act, as amended, and the aforesaid Treasury Regulations and Circulars"; he accepted the Government's contention that "the (federal) Regulations must be read into the contract between the United States and (the bond purchaser) so as to become a part thereof." See Bodek v. Department of the Treasury, Bureau of the Public Debt, 532 F.2d 277, 279 n. 7 (2d Cir.), Cert. denied, 429 U.S. 849, 97 S.Ct. 137, 50 L.Ed.2d 122 (1976); Wolak v. United States, 366 F.Supp. 1106, 1111-12 (D.Conn.1973); Spicer v. United States, 217 F.Supp. 44 (D.Kan.1963), Aff'd, 332 F.2d 750 (10th Cir. 1964). See also Clearfield Trust Co. v. United States, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943) (federal common law applies in actions on contracts with the United States). Thus although this case has some aspects of a suit arising under a federal law or executive department regulation, the bonds are themselves contracts, and the regulations are incorporated into those contracts; accordingly, one may view the claim as essentially being "founded upon a contract" and hence a matter exclusively for the Court of Claims. Our decision that because of the contract aspects of this case the Tucker Act assigns jurisdiction to the Court of Claims and not the district court is reinforced by the Court of Claims' authority even over cases founded upon an Act of Congress or a regulation. Thus the Court of Claims has jurisdiction over this action whichever way it is characterized, and that jurisdiction is on these facts exclusive.
 
 
 7
 However, as we have said, this analysis may be simplistic if it involves simply an attempt to pigeonhole the case under one label ("arising under") or another (contract) in the hope that the pigeonholing itself will solve the problem. Fortunately or unfortunately, as the case may be, the law pertaining to federal jurisdiction in the area of suits against the United States upon United States obligations does not consist simply of convenient pigeonholes. See generally Cohen, The Broken Compass: The Requirement That a Case Arise "Directly Under Federal Law," 115 U.Pa.L.Rev. 890 (1967).
 
 
 8
 A more sophisticated analysis must also take into account the matter of sovereign immunity. The Tucker Act itself, after all, was a waiver of sovereign immunity for actions founded upon contract. See United States v. Sherwood, 312 U.S. 584, 586-87, 61 S.Ct. 767, 85 L.Ed. 1058 (1941); See also Glidden Co. v. Zdanok, 370 U.S. 530, 556-57, 564, 565, 82 S.Ct. 1459, 8 L.Ed.2d 671 (1962). A suit as here seeking specific relief against an officer of the sovereign acting not in any individual capacity but strictly as an official is a suit against the sovereign and absent a waiver of immunity is not maintainable because of the absence of subject matter jurisdiction. See Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682, 688, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949). As Larson put it, following Goldberg v. Daniels, 231 U.S. 218, 34 S.Ct. 84, 58 L.Ed. 191 (1913), and rejecting the theory of Goltra v. Weeks, 271 U.S. 536, 46 S.Ct. 613, 70 L.Ed. 1074 (1926):
 
 
 9
 (T)he action of an officer of the sovereign (be it holding, taking or otherwise legally affecting the plaintiff's property) can be regarded as so "illegal" as to permit a suit for specific relief against the officer as an individual only if it is not within the officer's statutory powers or, if within those powers, only if the powers, or their exercise in the particular case, are constitutionally void.
 
 
 10
 Id. at 701-02, 69 S.Ct. at 1467 (footnote omitted). In Larson, the Court distinguished suits for damages, where it would give "hospitable scope" to broadening the sovereign's liability, from suits for specific relief such as an injunction, a writ of mandamus, or a declaration. Id. at 703-04, 69 S.Ct. 1457. The latter involve "direct judicial interference," Id., with functions of Congress and the executive branch. Judge Gignoux, in his very thoughtful opinion above mentioned, Estate of Pingree v. Blumenthal, recognized, applied, and held controlling the principles of Larson. See also Dugan v. Rank, 372 U.S. 609, 620, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963). As Judge Gignoux said,
 
 
 11
 (a)t the very least the declaratory and injunctive relief sought would "operate against" the United States. The redemption of the Flower Bonds tendered by plaintiff in the application of the proceeds in payment of estate taxes would "compel (the Government) to act" in a particular manner, and early redemption of the bonds at face value undeniably "would expend itself on the public treasury."[8]
 
 
 12
 He pointed out that § 1331, under which the plaintiff in Pingree asserted jurisdiction, is not a general waiver of immunity, E. g., Beale v. Blount, 461 F.2d 1133, 1138 (5th Cir. 1972), and thus found a similar Flower Bond action to be "an unconsented suit against the sovereign."
 
 
 13
 Appellees do not challenge Judge Gignoux's decision on the issue of sovereign immunity, but they argue, evidently for the first time in their brief on this appeal, that the 1976 amendments to the Administrative Procedure Act (APA), 5 U.S.C. § 701, as amended by Pub.L.No.94-574, 90 Stat. 2721 (1976),[9] operate to confer subject matter jurisdiction upon the district court. In this regard the estate particularly relies on the amendment to 5 U.S.C. § 702 which provides in part that:
 
 
 14
 An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party.
 
 
 15
 Appellees rely extensively upon the House Report on the 1976 amendments[10] and particularly on the portion thereof that indicates that the recent special regulatory statutes authorizing federal review "do not cover many of the functions performed by the older executive departments, such as the Departments of State, Defense, Treasury, Justice, Interior, and Agriculture,"[11] and also upon a quotation from Dean Cramton of Cornell Law School on whom the Congress relied in adopting the 1976 amendments:
 
 
 16
 The problem is that judges who are not familiar with the history of the fiction and its purpose attempt to make determinations whether the suit is actually directed at the Government rather than the named defendant. This practice in turn raises a number of complex questions involving the relationship between the official and his employer the Government. If it is found that the Government is the actual defendant, and there is no specific statute authorizing judicial review, the suit is dismissed on the basis of sovereign immunity.[12]
 
 
 17
 Thus, appellees argue, Dugan v. Rank, supra, Larson v. Domestic & Foreign Commerce Corp., supra, as well as Hawaii v. Gordon, 373 U.S. 57, 83 S.Ct. 1052, 10 L.Ed.2d 191 (1963), all relied on in Judge Gignoux's opinion, no longer represent the law. Appellees maintain that the holding in Califano v. Sanders, 430 U.S. 99, 104-07, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977), that Section 10 of the Administrative Procedure Act is not a grant of jurisdiction, does not matter because the same 1976 amendments did constitute a jurisdictional grant in 28 U.S.C. § 1331 "except to the extent that some specific statute precludes review."[13] See, e. g., Stickelman v. United States, 563 F.2d 413, 415 n. 2 (9th Cir. 1977); Texas Acorn v. Texas Area 5 Health Systems Agency, Inc., 559 F.2d 1019, 1022 n. 5 (5th Cir. 1977). We are also referred to Hill v. United States, 571 F.2d 1098, 1102 (9th Cir. 1978), as holding that sovereign immunity is not a defense to an action brought prior to October 21, 1976, because the courts should decide cases based on the law at the time of decision.
 
 
 18
 A leading commentator has also made us aware that a "particular source of confusion" may turn out to be the relationship between the Tucker Act and the 1976 amendments above referred to. See Wright, Supra, § 4101, at 210. As the commentator indicates, "difficult problems undoubtedly will arise in trying to draw a line between actions that basically are contractual disputes and those seeking to rectify alleged official misbehavior." In this connection we are warned "to be careful not to subvert the congressional objectives underlying the enactment of the judicial review statute by allowing the Government to give an overly expansive scope to the notion of claims 'founded upon' contract." Id. at 210-11. But again, we seek to avoid deciding this case merely through the process of pinning on a label of either "contractual dispute" or "official misbehavior." We must carefully examine the effect of the 1976 amendments on the APA, § 1331, and the Tucker Act, mindful that in this case, as in Pingree, both sovereign immunity and the Tucker Act restrict the district court's jurisdiction under § 1331.
 
 
 19
 There are two answers to appellee's contention that the 1976 amendments to the APA require a result in this case different from Pingree. One possibility is that, notwithstanding the waiver of the defense of sovereign immunity in actions brought under the APA, the amendments do not affect the defense of sovereign immunity under § 1331. The second answer is that whatever effect the amendments may have had on sovereign immunity, they did not affect the further limitation on jurisdiction under § 1331 that the Tucker Act imposes.
 
 
 20
 First, we note that an action under § 1331 seeking nonstatutory review of agency action is distinct from an action under the APA. See the separate discussion of nonstatutory § 1331 actions in the House Report at 13-17, (1976) U.S.Code Cong. & Admin.News, pp. 6133-37. It is true that the same bill amended both the APA and § 1331, but it amended them in different ways and with different effects. Under the APA, the defense of sovereign immunity is no longer a bar to an action in which the plaintiff seeks relief other than money damages; under § 1331, failure to meet the jurisdictional amount is no longer a bar to an action against the United States, a federal agency, or a federal officer or employee in his official capacity.
 
 
 21
 We also note what the amendments did not do: they did not remove the defense of sovereign immunity in actions under § 1331. Not only does the language of the amendment to § 1331 fail to suggest any effect on sovereign immunity, but the House Report states the effect of the amendments on sovereign immunity in terms of § 702:
 
 
 22
 (T)he bill would provide for abolishment of the defense of sovereign immunity in certain actions against the United States. More specifically, it would add to section 702 a provision that an action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party. It would also provide that the United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States.
 
 
 23
 The law applicable to this case after the amendments thus can be summarized as follows: there is no subject matter jurisdiction under the APA because the Act itself is not a grant of jurisdiction, Califano v. Sanders, 430 U.S. at 105, 97 S.Ct. 980, and the amendments also do not provide for jurisdiction but only make it clear that sovereign immunity will not be a defense in actions in which jurisdiction does exist; there is also no jurisdiction under § 1331 because of sovereign immunity, a defense that the amendments did not affect. Just as prior to the amendments to § 1331 the absence of a jurisdictional amount under the APA did not negate the requirement of a minimum amount in controversy in actions under § 1331, now the waiver of sovereign immunity under the APA does not affect the limitation of the sovereign immunity defense on jurisdiction under § 1331.
 
 
 24
 Alternatively, we note that whatever the effect on the defense of sovereign immunity under § 1331, the amendments did not affect the further limitation on § 1331 jurisdiction imposed by the Tucker Act's grant to the Court of Claims of exclusive jurisdiction in cases founded upon contracts, including those that involve federal laws or regulations. We recognize that the status of sovereign immunity under § 1331 is not entirely clear because of the broad language in places in both Califano v. Sanders, supra, and the House Report. But this broad language must be read in context; and in this case, that requires a further examination of the role of the Tucker Act. For although the Court in Sanders did say that the "obvious effect" of the amendment to § 1331 is "to confer jurisdiction on federal courts to review agency action," 430 U.S. at 105, 97 S.Ct. at 984, sovereign immunity was not an issue in Sanders ; and to the extent that the Court discussed the relationship between § 1331 and the APA, the discussion was limited to the inference that could be drawn from the elimination of the jurisdictional amount under § 1331 in actions against federal agencies or officials. We note that appellees would more than satisfy the jurisdictional amount even if one were required, so, at least in this regard, the amendment to § 1331 does not affect them. Moreover, the Court noted that the amendment's effect was limited by a proviso that the conferring of jurisdiction was "subject . . . to preclusion of review statutes created or retained by Congress." Id. Similarly, the broad language in the House Report about the abolition of sovereign immunity is well tempered by subsequent disclaimers of any effect on other existing limitations on the court's power to grant relief, including an exclusive alternative remedy. The legislative history of the 1976 amendments as well as the amendments to §§ 703 and 704 of the APA strengthens this interpretation in light of the already precarious balance between the APA and the Tucker Act. Thus the 1976 amendments have no effect on our conclusion above that the Court of Claims and not the district court had jurisdiction. The Court of Claims had jurisdiction under prior law, and it still has jurisdiction.
 
 
 25
 As the commentator above cited notes, See Wright, Supra, § 4101, at 210, the legislative history makes it clear that the amendments do not affect the existing limitation of the Tucker Act on cases brought under the APA notwithstanding the waiver of sovereign immunity. In the words of the House Report,
 
 
 26
 The (Court of Claims Act) is intended to foreclose specific performance of government contracts. In the terms of the proviso, a statute granting consent to suit, I. e., the Tucker Act, "impliedly forbids" relief other than the remedy provided by the Act. Thus, the partial abolition of sovereign immunity brought about by this bill does not change existing limitations on specific relief, if any, derived from statutes dealing with such matters as government contracts, as well as patent infringement, tort claims, and tax claims.
 
 
 27
 H.Rep. at 13, (1976) U.S.Code Cong. & Admin.News, 94th Cong., 2d Sess., at 6133. The proviso in question is the third new sentence that the 1976 amendments added to § 702: "Nothing herein . . . confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought."[14] This clause of the proviso is said to provide for specific relief in the face of another statute granting consent to sue with respect to a particular subject matter "only if Congress has not intended that provision for relief to be exclusive." H.Rep. at 13, (1976) U.S.Code Cong. & Admin.News, p. 6133. Similarly, this proviso, although not withdrawing specific relief in a situation in which it is now available, "merely provides that new authority to grant specific relief is not conferred when Congress has dealt in particularity with a claim and intended a specified remedy to be the exclusive remedy." Id.
 
 
 28
 We are thus left with the propositions that the APA is not itself to be interpreted as an implied grant of subject matter jurisdiction to review agency actions, Califano v. Sanders, 430 U.S. at 105, 97 S.Ct. 980, and that because the amendments explicitly exclude cases in which monetary damages are involved, they do not affect the jurisdictional scheme under the Tucker Act. And to the extent that the Tucker Act impliedly forbids relief other than the remedy provided by the Act, viz., the specific relief sought here, that Act remains unaffected by virtue of Clause 2 of the proviso added to § 702 by the third new sentence.
 
 
 29
 Moreover, the amendments to §§ 703 and 704 reinforce these conclusions. The language of § 703, by requiring judicial review to proceed "in a court specified by statute" or "in a court of competent jurisdiction," suggests that Congress did not intend § 702 to be an independent fount of jurisdiction. Califano v. Sanders, supra, 430 U.S. at 106 n. 6, 97 S.Ct. 980. Section 703 also excepts from judicial review agency action for which and to the extent that "prior, adequate and exclusive opportunity for judicial review is provided by law . . . ." Similarly, the first sentence of § 704 provides that "(a)gency action made reviewable by statute and final agency action for which There is no other adequate remedy in a court are subject to judicial review" (emphasis added). Arguably, therefore, only if a suit in the Court of Claims under its jurisdiction, § 1491, were inadequate would an action lie under the APA. Again, it is the interrelationship between the Tucker Act and APA that controls.
 
 
 30
 Appellees argue that suit in the Court of Claims would be inadequate because the only way that they could reduce their claim to one for damages would be to sell the bonds, but the sale would deprive them of an action to settle the issue of ownership. Moreover, they argue that the Court of Claims cannot provide an adequate remedy because it cannot grant declaratory or injunctive relief. See Richardson v. Morris, 409 U.S. 464, 465-66, 93 S.Ct. 629, 34 L.Ed.2d 647 (1973). But a Court of Claims remedy is "an adequate remedy in a court" within the meaning of 5 U.S.C. §§ 703, 704, thus precluding APA review. Alabama Rural Fire Insurance Co. v. Naylor, 530 F.2d 1221 (5th Cir. 1976). In Alabama Rural, the gravamen of the complaint was breach of contract against the government. The court recognized that if it held in a suit for specific performance and not for money damages that the district court had jurisdiction under the APA to exercise equitable powers to compel the United States to perform a contract, the jurisdiction of the Court of Claims would be destroyed by implication. Id. at 1229-30. The court held that the Tucker Act was an adequate remedy, noting that the Court of Claims was "able without undue difficulty, assuming it decides that the rescission was wrongful, to determine the costs incurred by Alabama Rural in anticipation of the performance of the contract . . . and its other damages occasioned by the breach of the contract." Id. at 1230. Here, similarly, the estate has tendered its bonds and had its tender refused; thus the contract breach, if there were any, has already taken place. An action is maintainable in the Court of Claims for money damages that the estate has sustained by the Government's alleged breach. Were we to decide otherwise we would be destroying the jurisdiction of the Court of Claims. See also International Engineering Co. v. Richardson, supra, 512 F.2d at 580-81 (suit for declaratory and injunctive relief not maintainable where damages were available in Court of Claims).
 
 
 31
 Although these decisions predate the 1976 amendments to 28 U.S.C. § 1331 and to the APA, their rationale is still fully applicable because the APA prior to the amendments surely was a waiver of sovereign immunity in cases to which it applied; and as previously stated the 1976 amendments did not affect the Tucker Act. See also Ove Gustavsson Contracting Co. v. Floete, 278 F.2d 912 (2d Cir.), Cert. denied, 364 U.S. 894, 81 S.Ct. 225, 5 L.Ed.2d 188 (1960) (complaint seeking declaration that contract with GSA was still in effect insufficient because Tucker Act provided adequate relief in Court of Claims).
 
 MANDAMUS
 
 32
 The mandamus jurisdiction, 28 U.S.C. § 1361, is intricate, if not mazelike, See Century Arms, Inc. v. Kennedy, 323 F.Supp. 1002 (D.Vt.), Aff'd per curiam, 449 F.2d 1306 (1971), Cert. denied, 405 U.S. 1065, 92 S.Ct. 1494, 31 L.Ed.2d 794 (1972), what Kenneth Culp Davis has colorfully called "mandamus medievalism," Administrative Law of the Seventies 543 (1976), but fortunately it is unnecessary for us to explore the technicalities or find our way through the maze here. The mandamus statute is simply not a general waiver of the sovereign's immunity. White v. Administrator, 343 F.2d 444 (9th Cir. 1965); See Larson v. Domestic & Foreign Commerce Corp.,supra. It is, as Judge Gignoux pointed out in his opinion, Estate of Pingree v. Blumenthal, supra, "firmly established" that the mandamus statute does not alter "traditional concepts of the doctrine of sovereign immunity" and "makes no change in the substantive law of mandamus." E. g., Carter v. Seamans,411 F.2d 767, 773 (5th Cir. 1969), Cert. denied, 397 U.S. 941, 90 S.Ct. 953, 25 L.Ed.2d 121 (1970). As it was succinctly put by a Massachusetts district judge, "(c) ertainly, Congress never intended § 1361 to be interpreted so as to allow the extraordinary writ of mandamus to be converted into a device for obtaining piece-meal solution of contractual disputes to which the United States is a party." Massachusetts v. Connor, 248 F.Supp. 656, 660 (D.Mass.1965), Aff'd per curiam, 366 F.2d 778 (1st Cir. 1966). What we have said, then, with respect to federal question jurisdiction is equally applicable to mandamus jurisdiction; neither supports the appellees in this case. Lovallo v. Froehlke, supra, which the district court relied upon, relates to the substantive law of mandamus and, if anything, furnishes additional grounds for denying the writ on the merits if we had to reach them as Judge Gignoux's opinion in Pingree, supra, points out; but because we need not reach the merits we do not.
 
 
 33
 Judgment reversed; cause remanded with directions to the district court to dismiss the complaint on the ground of lack of subject matter jurisdiction.
 
 
 
 [1]
 Pub.L.No.86-346, § 105(b)(1), 73 Stat. 622 (1959), repealed 31 U.S.C. § 754(b), but the repeal does not affect the bonds at issue in this case
 
 
 [2]
 The agents for the decedent purchased bonds of five different series with interest rates ranging from 3% To 41/8% And maturing between 1978 and 1994
 
 
 [3]
 31 C.F.R. § 306.28(b) provides:
 Conditions. The bonds presented for redemption under this section must have (1) been owned by the decedent at the time of his death and (2) thereupon constituted part of his estate . . . .
 
 
 [4]
 Prior to its amendment in 1976 by Pub.L.No.94-574, § 2, 90 Stat. 2721 (1976), 28 U.S.C. § 1331 provided:
 The district courts shall have original jurisdiction of all civil actions wherein the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and arises under the Constitution, laws, or treaties of the United States.
 
 
 [5]
 28 U.S.C. § 1331 now provides:
 The district courts shall have original jurisdiction of all civil actions wherein the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and arises under the Constitution, laws, or treaties of the United States except that no such sum or value shall be required in any such action brought against the United States, any agency thereof, or any officer or employee thereof in his official capacity.
 
 
 [6]
 28 U.S.C. § 1491 provides in pertinent part:
 The Court of Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.
 
 
 [7]
 28 U.S.C. § 1346(a) provides in pertinent part:
 The district courts shall have original jurisdiction, concurrent with the Court of Claims, of:
 (2) Any other civil action or claim against the United States, not exceeding $10,000 in amount, founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.
 
 
 [8]
 Judge Gignoux's quotations refer to Hawaii v. Gordon, 373 U.S. 57, 58, 83 S.Ct. 1052, 10 L.Ed.2d 191 (1963) ("The general rule is that relief sought nominally against an officer is in fact against the sovereign if the decree would operate against the latter. E. g., Dugan v. Rank, 372 U.S. 609, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963); Malone v. Bowdoin, 369 U.S. 643, 82 S.Ct. 980, 8 L.Ed.2d 168 (1962); Larson v. Domestic & Foreign Corp., 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949)."), and Dugan v. Rank, 372 U.S. 609, 620, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963) ("The general rule is that a suit is against the sovereign if 'the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration,' Land v. Dollar, 330 U.S. 731, 738, 67 S.Ct. 1009, 91 L.Ed. 1209 (1947), or if the effect of the judgment would be 'to restrain the Government from acting, or to compel it to act.' Larson v. Domestic & Foreign Corp., (337 U.S.) at 704, 69 S.Ct. 1457; Ex parte New York, 256 U.S. 490, 502, 41 S.Ct. 588, 65 L.Ed. 1057 (1921).")
 
 
 [9]
 This same Act also amended 28 U.S.C. § 1331. See notes 4-5 and accompanying text Supra
 
 
 [10]
 H.R.Rep.No.94-1656, 94th Cong., 2d Sess., Reprinted in (1976) U.S.Code Cong. & Admin.News, p. 6121 (hereinafter H.Rep.)
 
 
 [11]
 Id. at 5, (1976) U.S.Code Cong. & Admin.News at 6125
 
 
 [12]
 Id., (1976) U.S.Code Cong. & Admin.News at 6125-26
 
 
 [13]
 The quoted language is from Stickelman v. United States, 563 F.2d 413, 415 n. 2 (9th Cir. 1977), and it refers to one of the most important exceptions to reviewability under the Administrative Procedure Act. 5 U.S.C. § 701(a)(1) provides that "(t)his chapter applies . . . except to the extent that (1) statutes preclude judicial review."
 
 
 [14]
 The House Report explicitly discusses the relationship between the removal of the defense of sovereign immunity and the other traditional limitations on judicial relief:
 In considering these recommended additions, it is important to note that the amended section 702 would specifically provide that it would not affect other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground. Further, section 702 clearly would specify that it does not confer authority to grant relief if any other statute granting consent to suit expressly or impliedly forbids the relief which is sought.
 H.Rep. at 2, (1976) U.S.Code Cong. & Admin.News, p. 6122. Over and over, the House Report emphasizes that the relationship existing between the APA and other doctrines of reviewability other than sovereign immunity is unchanged. See, e. g., H.Rep. at 12, (1976) U.S.Code Cong. & Admin.News, pp. 6132-33: "S. 800 is not intended to affect or change defenses other than sovereign immunity. . . . (T)he amendment to 5 U.S.C. section 702 is not intended to permit suit in circumstances where statutes forbid or limit the relief sought."