Jane DOE, Individually and on behalf of her four infant children,
Plaintiff–Appellant,

v.

Benjamin CIVILETTI, United States Attorney General, John Fallon, Director, Northeastern Region, Federal Drug Enforcement Administration, Norman A. Carlson, Director, Federal Bureau of Prisons, Jack Walsh, United States Marshals Service, and the United States of America, Defendants–Appellees.

No. 151, Docket 79–6250.

United States Court of Appeals, Second Circuit.

Argued Sept. 19, 1980.
Decided Oct. 15, 1980.

Jo Ann Cahn, New York City, for plaintiff–appellant.

Twila L. Perry, Asst. U. S. Atty., S. D. New York, New York City (John S. Martin, Jr., U. S. Atty., Michael H. Dolinger, Asst. U. S. Atty., New York City, of counsel), for defendants–appellees.

Before WATERMAN, KAUFMAN and MESKILL, Circuit Judges.

IRVING R. KAUFMAN, Circuit Judge:

Aware that threats of retaliation were discouraging Government witnesses from testifying against participants in organized crime, Congress ten years ago passed Title V of the Organized Crime Control Act of 1970. The law authorized the Attorney General to provide for the protection and subsistence of persons who might testify for the Government, or did so testify, at the trials of organized crime figures. It vested the Attorney General with broad discretion to determine which witnesses would receive Government protection, and to decide how that protection would be secured. Since its inception, the so–called Witness Protection Program ("the Program") has been highly successful in producing convictions against organized crime figures. The Program also has an exceptional record for safeguarding its participants.

The complaint in this case, brought by a disappointed former participant, invites us to review and restrict the Attorney General's broad discretion to administer the Program. Moreover, it asks us to ignore the well–established rule that the federal courts do not have power to order specific performance by the United States of its alleged contractual obligations. In light of that rule, and because we find the Attorney General's decisions regarding the Program are largely insulated from judicial review, we decline these invitations, and affirm the dismissal of the complaint.

I. A.

Title V of the Organized Crime Control Act contains four short sections. The three pertinent here provide, in full:

Sec. 501. The Attorney General of the United States is authorized to provide for the security of Government witnesses, potential Government witnesses, and the families of Government witnesses and potential witnesses in legal proceedings

against any person alleged to have participated in an organized criminal activity.

Sec. 502. The Attorney General of the United States is authorized to rent, purchase, modify, or remodel protected housing facilities and to otherwise offer to provide for the health, safety, and welfare of witnesses and persons intended to be called as Government witnesses, and the families of witnesses and persons intended to be called as Government witnesses in legal proceedings instituted against any person alleged to have participated in an organized criminal activity whenever, in his judgment, testimony from, or a willingness to testify by, such a witness would place his life or person, or the life or person of a member of his family or household, in jeopardy. Any person availing himself of an offer by the Attorney General to use such facilities may continue to use such facilities for as long as the Attorney General determines the jeopardy to his life or person continues.

\* \* \* \* \* \*

Sec. 504. There is hereby authorized to be appropriated from time to time such funds as are necessary to carry out the provisions of this title.

Pub.L. 91–452, Title V, §§ 501, 502, 504, 84 Stat. 933 (1970), *reprinted in* 18 U.S.C. prec. § 3481 (Supp.1980).[1]

The Attorney General has delegated his power to admit Government witnesses into the Program to the United States Marshals Service. 28 C.F.R. § 0.111(c) (1979).[2] The delegation is exclusive. No other persons have any authority to make decisions or representations concerning the Program:

Investigative Agents and [other government] Attorneys are not authorized to make representations to witnesses regarding funding, protection or relocation. Neither are they authorized to make representations to prisoner/witnesses regarding where they will be housed. These matters are for decision by authorized representatives of the U. S. Marshals Service only. Representation or agreements made without authorization will not be honored by the U. S. Marshals Service.[3]

Pursuant to this exclusive delegation, the Marshals Service admits unincarcerated witnesses into the Program only after execution of "Memoranda of Understanding." Once a witness signs a Memorandum of Understanding, the Marshals Service assumes responsibility for his physical safety. The Service may either assign Marshals to guard the witness, or give the witness a new identity and relocate him to another part of the country. If the witness is relocated, the Marshals may provide him with subsistence payments.

### B.

A statement of the facts underlying the case is essential to our discussion of the applicable law. Jane Doe and Richard Roe[4] were married in 1961. Doe and Roe have four children who, at the time of the trial in this case, ranged in age from thirteen to eighteen. In 1970, a New York state jury convicted Roe of murder and rape. Six years into his sentence, while incarcerated at the New York State prison at Greenhaven, Roe was introduced to Ed

---

1. Further Congressional authorization for the Witness Protection Program appears at 28 U.S.C. § 524 (1976). *See United States v. Librach*, 536 F.2d 1228 (8th Cir.), *cert. denied*, 429 U.S. 939, 97 S.Ct. 354, 50 L.Ed.2d 308 (1976).

2. 28 C.F.R. § 0.111(c) (1979) provides:

 Subject to the general supervision of the Attorney General . . . the Director of the U.S. Marshals Service shall direct and supervise all activities of the U.S. Marshals Service including:

(c) Provision for the health, safety, and welfare of government witnesses and their families pursuant to sections 501–504 of Pub.L. 91–452 (18 U.S.C. prec. § 3481).

3. Department of Justice Order OBD 2110.2, ʻ 7(d) (January 10, 1975).

4. We granted Jane Doe leave to proceed under a pseudonym on June 19, 1980. Richard Roe is not a party to this suit; we use his pseudonym for reasons of security.

Magno, an officer of the federal Drug Enforcement Administration ("DEA"). Roe agreed to assist Magno in his investigations of drug trafficking by organized crime figures. Doe also aided Magno's inquiries. She introduced Magno to drug traffickers as her cousin, lent him her car to substantiate his "cover," and passed information to Magno from Roe.

In early September, 1978 Roe and Doe's cooperation with the DEA bore fruit. One of the principal targets of Magno's investigation was arrested on charges of violating federal narcotics laws. With this arrest, further concealment of Doe's involvement with the Government became impossible. To avoid retaliation against her, the Marshals secreted Doe and her children in a hotel in Manhattan for several days. There, Doe signed a Memorandum of Understanding with the Marshals, enrolling herself and her children in the Witness Protection Program. She later signed other parts of the Memorandum at a hotel in Connecticut, where she and her children stayed for a time before being relocated to Texas. The Memorandum provided, in part:

> Protection and maintenance are not provided in return for testimony. This memorandum is not a contract or an agreement to provide protection or maintenance in return for testimony.... Moreover, since it is within the Attorney General's discretion to approve participation in the Program, the witness may be terminated from the Program when the Attorney General determines that the life or person of the witness is no longer in danger, or for other reasons deemed ap-

propriate by the Attorney General or his representative.

One section of the Memorandum required Doe to list all promises made to her by investigative agents and government attorneys. Doe wrote: "DEA–Ed Magno–stated to me that after the investigation was over my husband Ken and I would be able to be together more often than when he was at Greenhaven prison." [5]

Upon arrival at their new home in Texas, Doe and her children commenced receiving $1,006 per month in subsistence benefits. Periodically during her stay in Texas, Doe was transported, at Government expense, to visit her husband in New York. On May 16, 1979, after Doe had been in Texas for several months, Luther Jones, a United States Marshal, told her he had arranged an employment interview for her. The interview was for a job on the night shift at an assembly plant. Without inquiring as to the character or specific hours of the job, Doe cited an alleged complete emotional inability to work and refused to appear at the appointment. In August 1979, Jones returned to inform Doe that the Department of Justice had decided to terminate her subsistence benefits the following month.

In September, ignoring the warnings of Special United States Attorney Joel Cohen, Doe brought her family back to New York. Shortly thereafter, she initiated the present action on behalf of herself and her four children. Her complaint prayed for orders mandating her protection and her re–enrollment in the Witness Protection Program, and for an injunction to attain these ends *pendente lite*. Named as defendants were,

---

**5.** The Memorandum of Understanding provided further:

> This memorandum and it's [sic] appendices, encompass all of the assistance which will be provided. Assistance not specifically contained herein, will not be provided by the United States Marshals Service, except as may be amended in writing. Investigative agents and government attorneys are not authorized to make representations concerning assistance which will be provided in effecting protection and relocation. Any representations made by such investigative agents or

attorneys, which are outside those expressly prescribed herein, are made without authority and will not be honored by the United States Marshals Service.

> . . . . .

> Such actions as returning to the danger area without United States Marshals Service protection or against instructions of United States Marshals Service personnel, and involvement in criminal activity will result in *IMMEDIATE TERMINATION* from the Witness Protection Program.

*inter alia*, the Attorney General, the Regional Director of the Federal Drug Enforcement Administration, and the Director of the Federal Bureau of Prisons.[6]

Judge Griesa consolidated the hearing on the preliminary injunction with the trial on the merits, and the case was heard in late October 1979. Doe [7] called three principal witnesses at trial. The first, Roe, testified concerning the terms of several promises which the Government allegedly made to him and his wife. He stated that on numerous occasions in 1977, Magno assured them that if they continued to cooperate with the DEA, they would receive several benefits. Roe claimed they were told he would spend only two or three more years in prison, and would be transferred to a minimum security facility. The Government, he testified, promised to support Doe and their children for the remainder of Roe's confinement. Roe conceded these alleged promises were never reduced to writing.

He also asserted that in May 1979, Special Attorney Joel Cohen, a member of the Organized Crime Strike Force in Brooklyn, was present when DEA officers other than Magno promised to provide subsistence to Roe's family. Roe acknowledged, however, that United States Marshal Al McNeill explained to him that the Marshals Service does not honor oral promises made by government officials. Roe also admitted that no Marshal had ever promised him subsistence payments for his family. Doe substantially corroborated her husband's testimony concerning the promises government agents had allegedly made to them.

Another of Doe's witnesses, Special Attorney Cohen, contradicted much of Roe's and Doe's testimony. Cohen maintained he had never promised either of them subsistence benefits if they enrolled in the Program. He stated further that he never was present when DEA agents allegedly promised subsistence payments to Doe or a reduction of his prison sentence to Roe. Moreover, Cohen reported that Magno had unequivocally denied making any promises concerning Roe's sentence.[8]

Although their subsistence payments were terminated, Doe and her children did not lose their protected status until they violated one of the key terms of the Memorandum of Understanding. The Memorandum provided that a witness's unauthorized return to an area in which his life would be endangered would result in his immediate expulsion from the Witness Protection Program. In October 1979, Doe and her children returned to New York–the "danger zone"–without permission from the Marshals Service. They were never formally expelled from the Program, but during argument in the district court, the assistant United States Attorney stated that he considered their participation in the Program to have been terminated upon their return to New York.

At the close of Doe's evidence, the Government moved to dismiss the complaint for lack of subject matter jurisdiction and for failure to show any right to relief. Judge Griesa parsed Doe's complaint in a determined attempt to ensure that he had jurisdiction over all of her claims. With the aid of Doe's attorney, he identified four separate prayers for relief: (1) an order requiring the Marshals to take all necessary steps to secure Doe's safety, (2) an injunction requiring them to provide continued subsistence benefits for Doe and her children, (3) a claim for $2,012, representing the two monthly payments allegedly owing at the time Doe filed her complaint, and (4) an order requiring the Government to re-enroll Doe in the Witness Protection Program.

Judge Griesa dismissed Doe's first claim on the merits, holding that she had forfeit-

---

**6.** The complaint was amended at trial to add the United States as a defendant.

**7.** We consider the arguments of Doe and her children to be identical, and for the sake of convenience refer only to Doe.

**8.** Magno was on assignment in South America at the time of the trial, and did not testify. A hearsay objection to Cohen's testimony does not appear to have been made.

ed any right to protection when she came back to New York against the advice of the Marshals Service. He dismissed her second claim on jurisdictional grounds, and denied the third because the DEA agents and government attorneys with whom Doe allegedly had contracted did not have authority to bind the United States. Judge Griesa viewed Doe's fourth claim as subsumed in the other three, and dismissed it without citing additional reasons.

## II.

Before deciding the merits of Doe's claims, we consider initially the district court's jurisdiction to hear this case. Doe's complaint alleged jurisdiction under 28 U.S.C. § 1331 (Supp.1980) and 28 U.S.C. § 1346(a)(2) (Supp.1980) ("the Tucker Act").[9] On appeal, she has also asserted jurisdiction under the mandamus statute, 28 U.S.C. § 1361 (Supp.1980).[10] We approve the district court's careful decision to fragment Doe's claims for purposes of jurisdictional analysis, and we adopt its characterization of those claims.

Doe's broadest allegation of jurisdiction is under the general federal question statute, 28 U.S.C. § 1331.[11] To the extent Doe's suit requests remedies for breach of an agree-

ment or understanding, it has its roots in the alleged understanding and not in a federal statute. See T.B. Harms Co. v. Eliscu, 339 F.2d 823 (2d Cir. 1964), cert. denied, 381 U.S. 915, 85 S.Ct. 1534, 14 L.Ed.2d 435 (1965); Farmer v. Philadelphia Electric Co., 329 F.2d 3, 7 (3d Cir. 1964).

Not all of Doe's claims arise under her alleged contract, however. Doe reads Title V of the Organized Crime Control Act[12] to bar the Attorney General from expelling witnesses from the Program unless he first determines they are no longer in danger. Assuming arguendo that this is a valid interpretation of the statute, Doe, in any event, has not satisfied the jurisdictional prerequisites to suit. Simply put, an individual cannot sue the United States without its consent. Furthermore, a waiver of immunity is not lightly to be inferred. "[I]t has been said, in a Court of Claims context, that a waiver of the traditional sovereign immunity 'cannot be implied but must be unequivocally expressed.'" United States v. Testan, 424 U.S. 392, 399, 96 S.Ct. 948, 953, 47 L.Ed.2d 114 (1976), quoting United States v. King, 395 U.S. 1, 4, 89 S.Ct. 1501, 1502, 23 L.Ed.2d 52 (1969); Soriano v. United States, 352 U.S. 270, 276, 77 S.Ct. 269, 273, 1 L.Ed.2d 306 (1957).[13]

**9.** Doe also claimed jurisdiction under 42 U.S.C. § 1983 (1976). Because there is no allegation that state action, as opposed to federal action, gave rise to the facts set forth in the complaint, Doe does not press the argument on appeal.

**10.** The assertion of new grounds of subject matter jurisdiction enjoys an exception from our usual rule against considering points first raised on appeal. See Estate of Watson v. Blumenthal, 586 F.2d 925, 930 (2d Cir. 1978). See also Duke Power Co. v. Carolina Environmental Study Group, Inc., 438 U.S. 59, 68–72, 98 S.Ct. 2620, 2628–2630, 57 L.Ed.2d 595 (1978). Furthermore, a fair reading of Doe's complaint requesting an injunction that the Government "take all steps necessary to secure [her] safety," see Fed.R.Civ.P. 8(f), encompasses a prayer for mandamus relief.

**11.** Section 1331 (Supp.1980) provides in pertinent part:
 (a) The district courts shall have original jurisdiction of all civil actions wherein the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and arises under the Constitution,

laws, or treaties of the United States except that no such sum or value shall be required in any such action brought against the United States, any agency thereof, or any officer or employee thereof in his official capacity.

**12.** Pub.L. 91-452, Title V, §§ 501–504, 84 Stat. 933 (1970), reprinted in 18 U.S.C. prec. § 3481 (Supp.1980).

**13.** Doe cannot circumvent the barrier by suing Government officials rather than the Government itself. It is well settled that a plaintiff's nominal classification of the opposing party is not dispositive.
 A suit against an officer of the United States is one against the United States itself ... if "the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration," Land v. Dollar, 330 U.S. 731, 738, 67 S.Ct. 1009, 1012, 91 L.Ed. 1209 (1947); or if the effect of the judgment would be "to restrain the Government from acting, or to compel it to act," Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682, 704, 69 S.Ct. 1457, 1468, 93 L.Ed. 1628 (1949).

■ Section 1331 is in no way a general waiver of sovereign immunity. Such a waiver, if it exists at all, must be sought in the statute giving rise to the cause of action. The provision on which Doe relies, Title V of the Organized Crime Control Act, nowhere suggests that Congress meant to waive the Government's immunity from suit or that any Government agent was authorized to waive immunity. The relevant legislative history [14] reveals that Title V was intended only to give the Attorney General power and money to protect government witnesses. It does not imply, much less "unequivocally express," that the statute was intended to expand the Government's amenability to suit.

■ Doe looks also to the Administrative Procedure Act ("APA") [15] in her search for a waiver of sovereign immunity. APA section 1, which provides a right to judicial review of agency action, is limited to actions "seeking relief other than money damages." Thus, the APA cannot be considered a grant of jurisdiction over Doe's claims for money. But even with respect to Doe's equitable claims, the APA is of little help, for it does not confer jurisdiction on the federal courts. *Califano v. Sanders*, 430 U.S. 99, 104–07, 97 S.Ct. 980, 983–985, 51 L.Ed.2d 192 (1977). The waiver of sovereign immunity contained in section 702 only "make[s] it clear that sovereign immunity will not be a defense in actions in which jurisdiction does exist." *Estate of Watson v. Blumenthal*, 586 F.2d 925, 932 (2d Cir. 1978). The APA was never intended to "affect the limitation of the sovereign immunity defense on jurisdiction under [the applicable jurisdictional statute]." *Id.*

■ Nor is the mandamus statute [16] an all–purpose waiver of the Government's immunity from suit. *Estate of Watson, supra,* 586 F.2d at 934–35. "Certainly, Congress never intended § 1361 to be interpreted so as to allow the extraordinary writ of mandamus to be converted into a device for obtaining piece-meal solution of contractual disputes to which the United States is a party." *Massachusetts v. Connor,* 248 F.Supp. 656, 660 (D.Mass.), *aff'd per curiam,* 366 F.2d 778 (1st Cir. 1966).

■ Doe's arguments under the Tucker Act are more focused. Section 1 of the Tucker Act, 28 U.S.C. § 1346(a)(2) (Supp. 1980), provides in pertinent part:

> The district courts shall have original jurisdiction, concurrent with the Court of Claims of:
>
> . . . . .
>
> (2) Any other civil action or claim against the United States, not exceeding $10,000 in amount, founded either upon the Constitution, or any Act of Congress,

*Gnotta v. United States,* 415 F.2d 1271, 1277 (8th Cir. 1969) (Blackmun, J.), *cert. denied,* 397 U.S. 934, 90 S.Ct. 941, 25 L.Ed.2d 115 (1970).

14. H.Rep. No. 91–1549, 91st Cong., 2d Sess., *reprinted in* [1970] U.S.Code Cong. & Ad.News 4007, 4024; S.Rep. No. 91–617, 91st Cong., 1st Sess. 59–60 (1969).

15. 5 U.S.C. § 702 (1976) provides:
 A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party. The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States: Provided, That any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance. Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.

16. 28 U.S.C. § 1361 (Supp.1980) provides:
 The district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff.

or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not ·sounding in tort . . . .

This provision is a waiver of sovereign immunity for contract actions, *Estate of Watson, supra,* 586 F.2d at 929; but not for actions based on federal statutes, *Testan, supra,* 424 U.S. at 398–99, 96 S.Ct. at 953; *Leonhard v. United States,* 633 F.2d 599, at ———————· (1980).

■ In exercising the jurisdiction granted it under the Tucker Act, the district court sits as an arm of the Court of Claims. Historically, the Court of Claims did not have equitable jurisdiction. *United States v. King, supra,* 395 U.S. at 3, 89 S.Ct. at 1502. Consequently, a district court exercising the powers of a Court of Claims also lacked equitable authority. *Richardson v. Morris,* 409 U.S. 464, 93 S.Ct. 629, 34 L.Ed.2d 647 (1973) (per curiam); *Casarino v. United States,* 431 F.2d 775 (2d Cir. 1970).

■ In response to the *King* decision, Congress empowered the Court of Claims to "issue orders directing restoration to office or position, placement in appropriate duty or retirement status, and correction of applicable records . . . to any appropriate official of the United States." 28 U.S.C. § 1491 (Supp.1980). Assuming, without deciding, that this provision also augments the juris-

diction granted to district courts under the Tucker Act, all but one of Doe's claims fall at the barrier of sovereign immunity. Her requests for orders directing the Government to protect her, to re -enroll her in the Witness Protection Program, and to provide subsistence benefits do not come within the narrow category of equitable relief Congress had in mind when it enlarged the jurisdiction of the Court of Claims.[17] Accordingly, the district court lacked the power to grant this relief.[18] Doe's prayer for $2,012 in back payments, however, does lie within the lower court's jurisdiction, since it is a claim for damage not exceeding $10,000 in amount.[19] We proceed to consider its merits.

### III.

A review of the facts cannot help but evoke sympathy for Doe and her children. Doe did assist the DEA in obtaining incriminating evidence against several drug traffickers. She passed messages between her husband and DEA agent Magno, and she helped Magno infiltrate drug operations. As her *quid pro quo,* she maintains she and her children were to receive subsistence payments until her husband was released from prison. But the important evidence weighs against Doe. When she signed the Memorandum of Understanding, for example, she was asked to list all covenants made

---

**17.** The amendments to 28 U.S.C. § 1491 (Supp. 1980) were intended to benefit Government employees and military personnel who formerly had to fragment suits for reinstatement and back pay between the District Court and the Court of Claims, respectively. *See* S.Rep. No. 92–1066, 92d Cong., 2d Sess., *reprinted in* [1972] *U.S.Code Cong. & Ad.News* 3116, 3118; 118 Cong.Rec. 15009, 15010 (1972). *See also Melvin v. Laird,* 365 F.Supp. 511, 518 19 (E.D. N.Y.1973).

**18.** Jurisdiction over Doe's claim for future payments of $1,000 per month is lacking for an additional reason. Because Doe's husband will remain in prison for at least two more years, this claim "exceed[s] $10,000 in amount." 28 U.S.C. § 1346(a)(2) (Supp.1980). Thus, since the District Court's jurisdiction is limited to claims not exceeding $10,000, the Court of Claims would have exclusive jurisdiction over

this request for relief, were it not for the bar of sovereign immunity.

**19.** The Government, citing *Rand v. United States,* No. 370 77 (Ct.Cl., Sept. 29, 1978), suggests that jurisdiction of this claim is also lacking. In *Rand,* a participant in the Witness Protection Program sued the United States alleging breach of an express oral contract. Rand failed to respond to the Government's motion for summary judgment, and her suit was dismissed. In the case before us, in contrast, Doe has presented considerable evidence bearing on the promises allegedly made to her. Furthermore, her allegations of oral agreements with the Government are not "so patently without merit as to justify . . . dismissal for want of jurisdiction." *Bell v. Hood,* 327 U.S. 678, 683, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946). *See Hagans v. Lavine,* 415 U.S. 528, 542·43, 94 S.Ct. 1372, 1381 1382, 39 L.Ed.2d 577 (1974).

to her by the Government, and she failed to set forth the allegedly promised payments in the appropriate space. Furthermore, she brought her children back to the danger zone against the directions of the Government.

We are handicapped by the district court's failure to make findings of fact in accordance with Rule 52(a), Fed.R.Civ.P., but Doe's assertions on appeal receive our consideration because the principal issue is not contested. The Government, Doe, and her husband are unanimous that no agreements concerning subsistence were made between Doe and any member of the Marshals Service. The statements on which Doe claims to have relied were allegedly made by DEA agent Magno and Special United States Attorney Cohen—all without authority of the Marshals Service.

The Memorandum of Understanding and Justice Department Order OBD 2110.2 (January 10, 1975) clearly state that only the Marshals Service can make binding representations concerning the Program to government witnesses. The Justice Department's interpretations of its statutory duties are entitled to great weight. *See Udall v. Tallman*, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965).

██ That Cohen and Magno lacked the actual authority to bind the Government is fatal to Doe's suit, for it is axiomatic that the United States is not bound by the unauthorized acts of its agents. "Whatever the form in which the Government functions, anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority." *Federal Crop Insurance Corp. v. Merrill*, 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947). Undoubtedly, this "actual authority doctrine" may produce harsh results, and did so in *Merrill* –in which farmers whose crops were destroyed in a drought were denied reimbursement because the government agent who sold crop insurance to them was without actual authority to do so. Justice Jackson, in dissent, was highly critical of the Court's result: "It is very well to say that those who deal with the Government should turn square corners. But there is no reason why the square corners should constitute a one-way street." *Id.* at 387–88, 68 S.Ct. at 4–5.

In spite of its rigor, the actual authority doctrine has been scrupulously followed. *See, e. g., Dresser Industries, Inc. v. United States*, 596 F.2d 1231 (5th Cir. 1979), *cert. denied*, 444 U.S. 1044, 100 S.Ct. 731, 62 L.Ed.2d 730 (1980); *Jackson v. United States*, 573 F.2d 1189 (Ct.Cl.1978). The Court of Claims has not hesitated to apply this rule in cases almost identical to the one now before us. For example, in *Doe v. United States*, No. 457-78 (Ct.Cl. May 16, 1980), two former participants in the Witness Protection Program alleged that government agents promised them lifetime security in return for their cooperation in an investigation of political corruption. The Court of Claims dismissed their suit, observing it seemed to be a classic case for application of the actual authority doctrine. *Id. See also Handsaker v. United States*, No. 231-79C (Ct.Cl. Apr. 4, 1980); *Rand v. United States*, No. 370-77 (Ct.Cl. Sept. 29, 1978).

Doe contends, however, that the actual authority doctrine has no place in the present action. She maintains that "principles, borrowed from the commercial world, are inapposite to the ends of criminal justice,"[20] and finds support in cases granting specific enforcement of plea bargain "contracts." *E. g., Santobello v. New York*, 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971). Compelling as her allegations would be, if true, the interests implicated in Doe's suit do not rise to the level of the constitutional rights on which the *Santobello* holding rested, and we cannot escape *Merrill*'s edict that actual authority is the rule. Doe relies heavily on *Roe v. United States Attorney*, 618 F.2d 980 (2d Cir. 1980) (per curiam), a suit brought by her husband to enforce an agreement to transfer him from a maxi-

---

**20.** Appellant's Brief at 12, *quoting United States ex rel. Selikoff v. Commissioner of Correction*, 524 F.2d 650, 654 (2d Cir. 1975), *cert. denied*, 425 U.S. 951, 96 S.Ct. 1725, 48 L.Ed.2d 194 (1976).

mum to a minimum security prison. We declined to apply the actual authority doctrine in *Roe*, resting our refusal to order enforcement of the promise instead on Roe's failure to rely on the government's promise, and on the strong public interest in upholding the government's broad discretion in law enforcement activities.

 Like the criminal defendants who sue to enforce plea bargains, Roe was in prison when the promise was made. Like them, his liberty was seriously implicated by the promise. Had Roe shown reliance on the Government's pledge, that liberty interest might well have led us to enforce the transfer agreement. Doe, however, is not in custody at all; under the Memorandum of Understanding she could leave the Program at any time. *See* H.Rep. No. 91 1549, 91st Cong., 2d Sess., *reprinted in* [1970] U.S.Code Cong. & Ad.News 4007, 4024. The interest she seeks to vindicate here is, in fact, an alleged property interest -a right to the $2,012.[21] Her claimed right to subsistence payments, while important, is not as fundamental as the right to a jury trial or the right to challenge constitutional defects in criminal proceedings. Only rights of that magnitude may be a basis for an exception to the actual authority doctrine. *See Santobello v. New York, supra.* Cf. *Jackson v. United States, supra* (actual authority doctrine bars recovery by army mechanic who was crippled for life in maneuvers, where mechanic had been promised at enlistment he would not be forced to participate in such activities).

### IV.

Although we hold for the United States in this case, our decision should not be construed to approve the Government's actions here. We sympathize with Doe's chagrin at the refusal of the Marshals Service to honor promises allegedly made by other United States officials, and we understand her confusion at divisions of authority within the Justice Department. But effective law enforcement requires that the Attorney General be allowed to exercise his broad discretion to administer the Witness Protection Program unimpeded by the unauthorized acts of his subordinates. Were the law otherwise, the lowliest bureaucrat could frustrate important criminal investigations. Accordingly, we affirm the district court's dismissal of Doe's suit.

---

**21.** As a variation of her basic contract claim, Doe alleges that her due process rights were violated when her participation in the Program was terminated without a hearing. However, not every benefit bestowed by the Government is a "liberty" or a "property" interest deserving fifth amendment protection. *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), and the benefits granted Doe fall in the unprotected category. Clearly, the Organized Crime Control Act does not guarantee her subsistence payments of any kind. Similarly, the Memorandum of Understanding provides that subsistence payments may be terminated if a participant fails to accept employment. Finally, the Internal Revenue Service, whose interpretation of its statutory responsibilities deserves great weight, *see e. g., Udall, supra*, treats payments made under the Witness Protection Program as non taxable gratuities from the Government. *Doe v. United States*, No. 457 78 (Ct.Cl. May 16, 1980).