**WORLD WIDE MINERALS,
LTD., et al., Appellants,**

**v.**

**REPUBLIC OF KAZAKHSTAN,
et al., Appellees.**

No. 00–7250.

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 8, 2001.

Decided Aug. 2, 2002.

Anson M. Keller argued the cause for appellants. With him on the briefs was Marshall Lee Miller.

Waller T. Dudley argued the cause for appellees Republic of Kazakhstan and State Committee of the Republic of Kazakhstan on the Management of State Property. M. Melissa Glassman was on the brief. Stephen M. Colangelo entered an appearance.

Jared A. Goldstein argued the cause for appellee National Atomic Company Kazatomprom. With him on the brief was Thomas B. Wilner.

Carolyn B. Lamm argued the cause for appellee Nukem, Inc. With her on the brief were Francis A. Vasquez Jr. and Eric Grannon. Judd C. Lawler entered an appearance.

Before: GINSBURG, Chief Judge, ROGERS and GARLAND, Circuit Judges.

GARLAND, Circuit Judge:

In 1996 and 1997, World Wide Minerals Ltd., a Canadian corporation, entered into a series of agreements with the Republic of Kazakhstan. Pursuant to those agreements, World Wide took over the man-agement of one of Kazakhstan's major uranium complexes and loaned Kazakhstan several million dollars to fund the restoration of the facility. World Wide contends that, in return, Kazakhstan agreed (inter alia) to permit World Wide to export Kazakhstan uranium. World Wide alleges that Kazakhstan breached its agreements by failing to issue World Wide a uranium export license and by seizing its assets in Kazakhstan. World Wide further alleges fraudulent induce-ment, tortious interference, conversion, conspiracy, and violations of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961 *et seq.*[1]

The defendants in this case are Kazakhstan and two of its instrumentalities, as well as Nukem, Inc., a New York corporation that World Wide contends conspired with Kazakhstan in committing wrongful acts against World Wide. The district court concluded that Kazakhstan and its instrumentalities had waived sovereign immunity against suit, and that the court therefore had jurisdiction over the claims against these defendants under the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. §§ 1330, 1605(a)(1). The court nonetheless dismissed those claims pursuant to the act of state doctrine. The court also dismissed World Wide's claims against Nukem, holding that it did not have personal jurisdiction over that New York corporation because World Wide's injuries did not arise out of any act that took place in the District of Columbia.

We affirm the dismissal of World Wide's claims against the Kazakhstan entities, albeit on somewhat different grounds. Although we agree that Kazakhstan waived

---

1. Two of World Wide's subsidiaries (World Wide Resource Finance, Inc. and KazUran Corporation), as well as its sales agent (Nuclear Fuel Resources Corporation), are also plaintiffs in this case. For the sake of convenience, we refer to the plaintiffs collectively as World Wide.

sovereign immunity for some of World Wide's claims, we conclude that it did not waive immunity for all of the claims. As to those claims where there was no waiver, we affirm dismissal for lack of subject matter jurisdiction. As to the remaining claims against Kazakhstan and one of its instrumentalities, we agree with the district court that the act of state doctrine is fatal to World Wide's suit. This conclusion also removes any substantial federal question with respect to identical claims against the other instrumentality, a corporation wholly owned by Kazakhstan. Finally, because the dismissal of the claims against Nukem was based on a misunderstanding regarding the date upon which World Wide alleges that officials of Nukem and Kazakhstan met in the District of Columbia to conspire against it, we remand those claims to permit the district court to determine whether the facts are sufficient to establish personal jurisdiction.

I

In 1995, the Republic of Kazakhstan issued a decree announcing the privatization of the country's uranium industry and its intention to contract with foreign investors for the management of previously state-run facilities. Am. Compl. ¶ 40.[2] Shortly thereafter, World Wide submitted a proposal to take over the management of Tselinny Gorno–Khimicheskii Kombinat (TGK), a state holding company that operated a uranium complex located in the area of Kazakhstan's Northern Mines. After a period of negotiation, the parties entered into the four agreements that are at issue in this case.

The first agreement was the Management Agreement. That agreement, signed by World Wide and the State Committee of the Republic of Kazakhstan on the Management of State Property (Kazakhstan State Committee) on October 7, 1996, granted World Wide the right to manage and control the assets of TGK. *Id.* ¶ 56; Management Agreement ¶ 2.11. In return, World Wide agreed to satisfy TGK's outstanding debts and to implement a restructuring program for the uranium complex. Management Agreement ¶¶ 2.11(b), 2.22. The agreement listed a number of additional points "which have not been concluded in this Agreement" but which were to be "addressed in good faith negotiations," including the granting of a license to World Wide to export TGK uranium for international sale. *Id.* ¶ 2.17, Sched. 2 ¶ 2.3. World Wide was entitled to terminate the agreement if Kazakhstan did not grant it the license by December 16, 1996. *Id.* ¶ 2.18. Although World Wide never received the license, it did not suspend performance under the contract until April 30, 1997. Am. Compl. ¶ 73.

On November 14, 1996, World Wide, the Kazakhstan State Committee, and TGK executed a second agreement, the Loan Agreement. Under that agreement, World Wide agreed to lend TGK at least $5 million to fund the restoration and operation of the uranium complex. In the same month, World Wide took over management of the TGK complex and began to make loans under the Loan Agreement. *Id.* ¶¶ 58, 59, 61.

The third agreement was the Strategic Alliance Agreement, which World Wide entered into with Kazatomprom on February 28, 1997. Kazatomprom is a corporation, wholly owned by the Republic of Ka-

---

**2.** The facts set out in this Part are taken from World Wide's amended complaint and documents incorporated by reference therein. Because we are reviewing the district court's decision on a motion to dismiss, we must assume that the allegations of the complaint are true, although many are disputed by the defendants. *See Saudi Arabia v. Nelson,* 507 U.S. 349, 351, 113 S.Ct. 1471, 1474, 123 L.Ed.2d 47 (1993).

zakhstan, that is charged with managing nuclear energy complexes and promoting the development of uranium production in Kazakhstan. *Id.* ¶ 60. In the Strategic Alliance Agreement, the parties agreed to form a joint venture to explore, develop, and mine several other uranium sources, including deposits in Kazakhstan's Southern Mines, and to market uranium from those sources. *Id.* ¶ 69. Kazatomprom also agreed to "assist" World Wide in obtaining a uranium export license from Kazakhstan. Strategic Alliance Agreement ¶ 8.2.

Finally, on March 25, 1997, World Wide, TGK, and the Kazakhstan State Committee entered into a fourth agreement, the Pledge Agreement. This agreement gave World Wide a security interest in the assets and shares of TGK as collateral for its loans. The Pledge Agreement also prohibited the transfer of any of the pledged assets or shares. Am. Compl. ¶¶ 70, 85; Pledge Agreement ¶ 5.1.3.

On March 27, 1997, following execution of the Pledge Agreement, World Wide entered into a contract with Consumers Energy Company, a Michigan utility, to deliver approximately $4.1 million worth of Kazakhstan uranium. In order to fulfill this contract, World Wide needed to receive an export license by May 30, 1997. By the end of April, however, World Wide had not received the necessary license, and, on April 30, it suspended mining operations at the TGK complex. Am. Compl. ¶¶ 71–73.

In May 1997, in response to its requests for an export license, a Kazakhstan official told World Wide that Kazakhstan had previously given another company, Nukem, exclusive rights to the entire quota of uranium that Kazakhstan was permitted to export to the United States. That quota was determined by a Suspension Agreement between the two countries. *Id.* ¶¶ 77, 78.[3] Although World Wide continued to seek an export license from Kazakhstan, and negotiated several extensions of its contract with Consumers Energy pending the grant of such a license, its final extension ran out on July 4, 1997. On July 10, the contract between World Wide and Consumers Energy was terminated. World Wide alleges that, during the period in which it was trying to obtain a license, Nukem approached Consumers Energy with an offer to sell it uranium in the event that World Wide failed to obtain the license, and that subsequently Nukem did sell Kazakhstan uranium to Consumers Energy. *Id.* ¶¶ 82–84.

Thereafter, what was left of World Wide's relationship with Kazakhstan quickly deteriorated. On August 1, Kazakhstan terminated the Management Agreement, declaring that World Wide had failed to fulfill its obligations. It then allegedly seized $1 million worth of World Wide's uranium and other property located at the TGK complex, and forced World Wide's employees to leave the country. *Id.* ¶¶ 86–87. Finally, on October 2, 1997, Kazakhstan issued a decree transferring all of the assets and shares of TGK to Kazatomprom. *Id.* ¶ 17; Republic of Ka-

---

**3.** Kazakhstan had entered into the Suspension Agreement in return for the United States' agreement to suspend an antidumping investigation initiated by the Department of Commerce under the Tariff Act, 19 U.S.C. § 1673a. *See* Agreement Suspending the Antidumping Investigation on Uranium from Kazakhstan ("Suspension Agreement"), *reproduced at* 57 Fed.Reg. 49,220, 49,222 (Oct. 30, 1992); Am. Compl. ¶ 33. The Suspension Agreement specifically provided that uranium exported to the United States required "export licenses and certificates ... issued in a manner determined by the Government of Kazakhstan, in accordance with laws of Kazakhstan." Suspension Agreement ¶ V.A., 57 Fed.Reg. at 49,224.

zakhstan, Ministry of Finance, Resolution No. 317 (Oct. 2, 1997) (J.A. at 431).

In May 1998, World Wide sued Kazakhstan, the Kazakhstan State Committee, Kazatomprom, and Nukem in the United States District Court for the District of Columbia. In its eleven-count amended complaint, World Wide alleged that Kazakhstan and the Kazakhstan State Committee (collectively Kazakhstan) breached their agreements with World Wide, fraudulently induced World Wide to enter into several of the agreements, wrongfully converted its property, tortiously interfered with its contracts, unlawfully conspired against it, and committed acts that violated RICO. In addition to damages for these violations, World Wide sought a declaratory judgment establishing its "right to market Kazakhstan uranium under the Suspension Agreement or otherwise." Am. Compl. ¶ 161. World Wide joined Kazatomprom in most of these counts, and joined Nukem as a defendant in the counts for tortious interference, conspiracy, and violation of RICO, and in its request for a declaratory judgment. Although World

Wide. alleges various wrongful conduct, the amended complaint identifies Kazakhstan's denial of its application for an export license as "the very heart of this matter." *Id.* ¶ 157.[4]

The defendants moved to dismiss World Wide's amended complaint, arguing that the court lacked personal and subject matter jurisdiction, and that the act of state doctrine barred adjudication of World Wide's claims. The district court granted the motions to dismiss, and denied World Wide's request to file a second amended complaint as futile. *World Wide Minerals Ltd. v. Republic of Kazakhstan,* 116 F.Supp.2d 98 (D.D.C.2000). The court began by holding that, because Kazakhstan had expressly waived its sovereign immunity in the Pledge Agreement, the FSIA, 28 U.S.C. §§ 1330(a) & (b), 1605(a)(1), gave the court personal jurisdiction over Kazakhstan and Kazatomprom and subject matter jurisdiction over all of World Wide's claims against them. 116 F.Supp.2d at 103.[5] The court concluded, however, that "granting World Wide relief

---

4. The eleven counts, and the defendants to which they apply, are as follows: Count I, against Kazakhstan and Kazatomprom, for breach of the Management Agreement; Count II, against Kazakhstan, for breach of the Loan Agreement; Count III, against Kazakhstan, for breach of the Pledge Agreement; Count IV, against Kazatomprom, for breach of the Strategic Alliance Agreement; Count V, against Kazakhstan and Kazatomprom, for fraud in the inducement to enter into · the Management and Loan agreements; Count VI, against Kazakhstan and Kazatomprom, for fraud in the inducement to enter into the Strategic Alliance Agreement; Count VII, against Kazakhstan and Kazatomprom, for conversion; Count VIII, against all defendants, for tortious interference with World Wide's contracts with its sales agent and Consumers Energy; Count IX, against all defendants, for civil conspiracy; Count X, against all defendants, for violation of RICO; and Count XI, against all defendants, for a declaratory judgment.

5. The FSIA grants United States courts both subject matter and personal jurisdiction (where service of process has been made) over any claim against a foreign state as to which the state is not entitled to immunity. 28 U.S.C. § 1330(a), (b). The district court held that, where one of the FSIA's exceptions to sovereign immunity (e.g., waiver) applies, a foreign government and its instrumentalities are subject to suit without the need to apply the "minimum contacts" test traditionally used in determining whether the assertion of personal jurisdiction satisfies due process. 116 F.Supp.2d. at 102–03. Subsequently, this circuit reached the same conclusion with respect to "an actual foreign government," but expressed no view as to whether that conclusion also applied to "other entities that fall within the FSIA's definition of 'foreign state'—including corporations in which a foreign state owns a majority interest." *See Price v. Socialist People's Libyan Arab Jamahiriya,* 294 F.3d 82, 99–100 (D.C.Cir.2002).

would require a judgment on the acts of a sovereign state," including Kazakhstan's failure to grant World Wide an export license and its decision to expropriate World Wide's property. Accordingly, the court held the claims against the Kazakhstan defendants barred by the act of state doctrine. *Id.* at 104.

The district court also dismissed World Wide's claims against Nukem, holding that it lacked personal jurisdiction over the corporation. The court rejected all of the jurisdictional theories asserted by World Wide, including the "transacting business" clause of the District of Columbia's long-arm statute, D.C.Code § 13–423(a)(1), and "conspiracy jurisdiction." The court rejected the latter two theories on the ground that the only act sufficient to satisfy their prerequisites took place after World Wide's injuries had already been incurred. 116 F.Supp.2d at 108. World Wide now appeals.

## II

We review the district court's dismissal of World Wide's complaint de novo, and must accept the complaint's allegations as true for purposes of this appeal. *See El–Hadad v. United Arab Emirates,* 216 F.3d 29, 31, 32 n. 5 (D.C.Cir.2000). In doing so, we consider only the allegations of the (first) amended complaint. Although World Wide indicated in its notice of appeal that it planned to challenge the district court's refusal to permit it to file a second amended complaint, *see* FED. R.CIV.P. 15(a), it failed to do so until its reply brief. As we have said many times before, a party waives its right to challenge a ruling of the district court if it fails to make that challenge in its opening brief. *See, e.g., Students Against Genocide v.*

*Department of State,* 257 F.3d 828, 834–35 (D.C.Cir.2001); *Board of Regents v. EPA,* 86 F.3d 1214, 1221 (D.C.Cir.1996); *see also Terry v. Reno,* 101 F.3d 1412, 1415 (D.C.Cir.1996) (holding that where the appellants listed challenges in the "Statement of Issues," but failed to brief them, the challenges were waived).

World Wide contends that none of the defendants' motions to dismiss should have been granted. In response, Kazakhstan, Kazatomprom, and Nukem assert that the district court was correct in ruling that a variety of threshold obstacles, including sovereign immunity, the act of state doctrine, and lack of personal jurisdiction, barred World Wide's claims. In the following three Parts, we address the issues relating to each defendant separately.

## III

World Wide's amended complaint levels ten of its eleven charges against Kazakhstan (including the Kazakhstan State Committee). They are: Count I (breach of the Management Agreement), Count II (breach of the Loan Agreement), Count III (breach of the Pledge Agreement), Count V (fraud in the inducement to enter into the Management and Loan agreements),[6] Count VI (fraud in the inducement to enter into the Strategic Alliance Agreement), Count VII (conversion), Count VIII (tortious interference), Count IX (civil conspiracy), Count X (violation of RICO), and Count XI (declaratory judgment). In Part III.A, we conclude that the district court lacked subject matter jurisdiction over seven of these counts, because Kazakhstan has sovereign immunity against their adjudication in United States courts. In Part III.B, we conclude that the remaining three counts were

---

**6.** Although the title of this count also alleges fraud in the inducement to enter into the "Preliminary Agreement," neither the count nor World Wide's briefs allege any damages or make any argument relating to that agreement, and we therefore give it no independent consideration.

properly dismissed pursuant to the act of state doctrine.

## A

■ We turn first to whether the district court was correct in concluding that it had subject matter jurisdiction over all of World Wide's claims against Kazakhstan. *See In re Papandreou,* 139 F.3d 247, 254–56 (D.C.Cir.1998) (holding that jurisdiction must be resolved before applying the act of state doctrine, because that doctrine is "a substantive rule of law").[7] The FSIA is "the sole basis for obtaining jurisdiction over a foreign state in our courts." *Argentine Republic v. Amerada Hess Shipping Corp.,* 488 U.S. 428, 434, 109 S.Ct. 683, 688, 102 L.Ed.2d 818 (1989). Under the FSIA, a district court has jurisdiction over a civil action against a foreign state for any claim "with respect to which the foreign state is not entitled to immunity." 28 U.S.C. § 1330(a). The Act provides that a foreign state is generally immune from the court's jurisdiction unless one of the exceptions listed in the statute applies. *Id.* §§ 1604, 1605; *Verlinden B.V. v. Central Bank of*

*Nigeria,* 461 U.S. 480, 488–89, 103 S.Ct. 1962,.1968–69, 76 L.Ed.2d 81 (1983).[8]

■ In the district court, World Wide argued that the court had subject matter jurisdiction under two FSIA exceptions: the waiver exception, 28 U.S.C. § 1605(a)(1), and the commercial activity exception, *id.* § 1605(a)(2). In its briefs on appeal, however, World Wide did not argue that the commercial activity exception was applicable, relying instead on the waiver exception.[9] And at oral argument, World Wide eschewed any reliance on the FSIA's commercial activity exception. Accordingly, we limit our inquiry to whether the district court had jurisdiction by virtue of Kazakhstan's waiver of immunity.[10] Under the FSIA's waiver exception, a state is not immune from suit in any case "in which the foreign state has waived its immunity either explicitly or by implication." *Id.* § 1605(a)(1). World Wide does not rely on a theory of implied waiver, but rather on the explicit waivers of sovereign immunity contained in the Pledge and Management agreements.[11]

---

7. In its reply brief, World Wide argues that we cannot review the district court's finding of subject matter jurisdiction because the appellees "failed to cross-appeal on this issue." World Wide Reply Br. at 11. To the contrary, we have an independent responsibility to consider that question. *See Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 95, 118 S.Ct. 1003, 1012–13, 140 L.Ed.2d 210 (1998).

8. World Wide does not dispute that the Kazakhstan State Committee is an "agency or instrumentality of a foreign state" within the meaning of the FSIA. 28 U.S.C. § 1603(a), (b); *see* World Wide Br. at xiii. As such, like Kazakhstan, the State Committee is entitled to immunity unless one of the statute's enumerated exceptions applies. *Id.* § 1604.

9. This was so despite the .fact that Kazatomprom devoted a substantial portion of its brief to arguing against the applicability of the commercial activity exception. *See* Kazatomprom Br. at 14–24.

10. The *defense* of sovereign immunity may be raised at any time because, if valid, it means that the court lacks power to hear the case. *See Steel Co.,* 523 U.S. at 94–95, 118 S.Ct. at 1012–13. A *challenge* to. sovereign immunity, by contrast, is an argument that can be waived. *See Watters v. Washington Metro. Area Transit Auth.,* No. 01–7092, slip. op. at 7 n.13 (D.C.Cir. July 17, 2002) (holding that a claim that sovereign immunity has been waived is itself waived if not argued on appeal).

11. As we have previously noted, the "FSIA does not define an implied waiver." *Creighton Ltd. v. Government of the State of Qatar,* 181 F.3d 118, 122 (D.C.Cir.1999). This circuit, however, has "followed the 'virtually unanimous' precedents construing the implied waiver provision narrowly." *Id.* (quoting *Shapiro v. Republic of Bolivia,* 930 F.2d 1013, 1017. (2d Cir.1991)). Courts have found implied waiver where a foreign state has filed a responsive pleading without rais-

**1162**

■ In general, explicit waivers of sovereign immunity are narrowly construed "in favor of the sovereign" and are not enlarged "beyond what the language requires." *Library of Cong. v. Shaw,* 478 U.S. 310, 318, 106 S.Ct. 2957, 2963, 92 L.Ed.2d 250 (1986) (internal quotation marks omitted); *see Watters v. Washington Metro. Area Transit Auth.,* No. 01–7092, slip. op. at 5, 2002 WL 1484943 *1 (D.C.Cir. July 12, 2002) (requiring "clear and unequivocal" waiver); *Forman v. Small,* 271 F.3d 285, 296 (D.C.Cir.2001). A foreign sovereign will not be found to have waived its immunity unless it has clearly and unambiguously done so. *See Aquamar S.A. v. Del Monte Fresh Produce N.A., Inc.,* 179 F.3d 1279, 1292 (11th Cir.1999) ("An express waiver under section 1605(a)(1) must give a clear, complete, unambiguous, and unmistakable manifestation of the sovereign's intent to waive its immunity." (internal quotation marks omitted)); *see also Maritime Int'l Nominees*

*Establishment v. Republic of Guinea,* 693 F.2d 1094, 1100 n. 10 (D.C.Cir.1982) (holding that under the FSIA, Congress contemplated waivers of a "specific and explicit nature").[12]

■ There is no question that Kazakhstan clearly indicated its intent to waive its immunity for the claims contained in Count I (breach of the Management Agreement) and Count III (breach of the Pledge Agreement), as both the Management and Pledge agreements contain express waivers of sovereign immunity—the latter referring specifically to the FSIA.[13] But the district court further held that the waiver in the Pledge Agreement indicated Kazakhstan's intention to waive immunity for World Wide's entire lawsuit. As to this we cannot agree. Neither the waiver in the Pledge Agreement, nor that in the Management Agreement, describes the kind of claims for which Kazakhstan waived immunity. And there is nothing "clear and unambiguous" about either

ing the defense of sovereign immunity. *Id.* at 123. They have also found implied waiver where the state has agreed to arbitrate or to adopt a particular choice of law, under circumstances not present in this case. *Id.; see id.* at 122 (" '[M]ost courts have refused to find an implicit waiver of immunity to suit in American courts from a contract clause providing for arbitration in a country other than the United States.' " (quoting *Frolova v. Union of Soviet Socialist Republics,* 761 F.2d 370, 377 (7th Cir.1985))); *id.* at 126 (holding "that Qatar did not, by agreeing to arbitrate in France, waive its sovereign immunity under § 1605(a)(1)"). As we have also noted, " 'courts have been reluctant to stray beyond these examples when considering claims that a nation has implicitly waived its defense of sovereign immunity.' " *Princz v. Federal Republic of Germany,* 26 F.3d 1166, 1174 (D.C.Cir.1994) (quoting *Frolova,* 761 F.2d at 377).

**12.** *Cf. C & L Enters., Inc. v. Citizen Band Potawatomi Indian Tribe,* 532 U.S. 411, 418, 421 n. 3, 423, 121 S.Ct. 1589, 1594, 149 L.Ed.2d 623 (2001) (holding that "to relin-

quish its immunity, a tribe's waiver must be clear" and "not ambiguous," and finding instructive "the law governing waivers of immunity by foreign sovereigns" (internal quotation marks omitted)).

**13.** The Management Agreement states: "In respect of any arbitration or legal action or proceedings arising out of or in connection with this Agreement, ... [the Kazakhstan State Committee] hereby irrevocably agrees not to claim and hereby irrevocably waives ... immunity for itself and the assets of the Republic of Kazakstan to the full extent permitted by the laws of such jurisdiction." Management Agreement ¶ 6.4. The Pledge Agreement states: "[T]he Grantor [defined as Kazakhstan and TGK] hereby irrevocably agrees not to claim and hereby irrevocably waives ... immunity for themselves and their Assets to the full extent permitted by the laws of such jurisdiction with the intent inter alia that the foregoing waiver of immunity shall have irrevocable effect for the purposes of the [FSIA] in any legal action or proceedings to which such Act applies." Pledge Agreement ¶ 19.5.

waiver other than that each extends to claims for breach of the agreement. in which it is contained.[14] We see nothing in these waivers to indicate that they extend to breaches of the two other agreements at issue in this case (the Loan and Strategic Alliance agreements), neither of which contains a waiver of its own.

Indeed, the fact that only two of the four agreements contain waivers is particularly significant in creating ambiguity. Although it could be argued that the parties saw no need for repetition once a waiver was made in the Management Agreement, which was the first of the four, that does not explain why they thought it necessary to include a waiver in the Pledge Agreement, which was the last. Moreover, regardless of what *could* be argued, the fact is that the presence of waivers in only two of four agreements creates real ambiguity as to Kazakhstan's intent. *Cf. Marra v. Papandreou*, 216 F.3d 1119, 1123 (D.C.Cir. 2000) ("If the Greek government were sued by Marra for breach of two different contracts, it certainly would have the prerogative to waive a sovereign immunity defense with respect to one of the contracts and invoke that defense for the oth-

er."). So, too, do provisions in both the Loan and Strategic Alliance agreements that suggest Kazakhstan did *not* contemplate that disputes over those agreements would be resolved in United States courts, but rather by arbitration in Kazakhstan and Sweden.[15]

Nor do we see evidence that, by waiving immunity for claims for breach of the Management and Pledge agreements, Kazakhstan unambiguously intended to expose itself to the miscellany of tort and tort-like claims with which World Wide has charged it. Unlike the claims for breach of those two contracts, which arise out of consensual agreements containing waivers of immunity, the tort claims arise out of exogenous law. Indeed, in this case that law is truly "exogenous." World Wide seeks application of the law of the United States (including RICO), *see* World Wide Opp'n to Mot. to Dismiss, notwithstanding that no American national was a party to any of the four agreements, and notwithstanding that each agreement declares that it "shall be governed by and construed in accordance with the laws of Kazakhstan." Management Agreement ¶ 6.1; Pledge Agreement ¶ 18.1; Loan Agreement ¶ 4.1; Strategic Alliance Agreement ¶ 9.2.[16] Plaintiff makes no argument and

14. Supporting the conclusion that the waivers do not apply to all of World Wide's claims is the fact that each of these agreements contains a provision limiting the agreement's scope. The Management Agreement states that "[t]he subject of this Agreement shall be the transfer to World Wide of the right to manage, control, use and own the State-owned or controlled block of shares in [TGK]." Management Agreement ¶ 1. And the Pledge Agreement includes an integration clause stating that "[t]his Pledge Agreement constitutes and contains the entire agreement of the parties." Pledge Agreement ¶ 21.1. Although the Pledge Agreement grants World Wide a security interest in TGK shares and assets, *id.* ¶ 2.1, it does not itself include an agreement to repay World Wide's loans to TGK.

15. *See* Strategic Alliance Agreement ¶ 9.3 ("If any dispute or difference arises out of or in connection with any matter in relation to this Strategic Alliance Agreement ..., the same shall be arbitrated between the Parties and the arbitration shall be conducted ... in Almaty, Kazakhstan."); Loan Agreement ¶ 4.2 ("If any default or dispute or difference ... arises out of or in connection with any matter or thing in relation to the provisions of this Agreement, ... any party may submit the Dispute to be settled by arbitration ... conducted in Stockholm, Sweden...."). Although an agreement to arbitrate may in some circumstances constitute an implied waiver of sovereign immunity, this is not such a circumstance and World Wide does not contend that it is. *See supra* note 11 and accompanying text.

16. Kazakhstan's contention that as a civil law

cites no cases that support extending the waivers to these kinds of claims, and analogous cases are to the contrary.[17]

In sum, we find that Kazakhstan clearly and unambiguously waived its sovereign immunity only for claims of breach of the Management and Pledge agreements, and we therefore hold that the district court only had jurisdiction to hear counts that make such claims. Those counts are Count I (breach of the Management Agreement) and Count III (breach of the Pledge Agreement), as well as Count XI (declaratory judgment) to the extent that it seeks a declaration that Kazakhstan breached the Management Agreement.[18] As for all of the other claims against Kazakhstan, there has been no waiver, and we therefore affirm their dismissal for lack of subject matter jurisdiction.

## B

Having concluded that the district court had subject matter jurisdiction over the claims in Counts I, III, and XI, we now turn to Kazakhstan's contention that another threshold objection—the act of state doctrine—bars adjudication of those counts. Although ordinarily we would first examine the validity of the district court's decision that it had personal jurisdiction over Kazakhstan, see *Papandreou*, 139 F.3d at 254–56, Kazakhstan does not dispute that decision on appeal. Unlike subject matter jurisdiction, a party waives the right to dispute personal jurisdiction by failing to contest it on appeal. *See Spann v. Colonial Village, Inc.*, 899 F.2d 24, 32–33 (D.C.Cir.1990).

The act of state doctrine "precludes the courts of this country from inquiring into the validity of the public acts a recognized foreign sovereign power committed within its own territory." *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 401, 84 S.Ct. 923, 926, 11 L.Ed.2d 804 (1964). It is applicable when "the relief sought or the defense interposed would [require] a court in the United States to declare invalid the official act of a foreign sovereign performed within" its boundaries. *W.S. Kirkpatrick & Co., Inc. v. Environmental Tectonics Corp.*, 493 U.S. 400, 405, 110 S.Ct. 701, 704, 107 L.Ed.2d

---

jurisdiction it does not recognize common law torts, may be still further evidence that Kazakhstan did not intend to waive immunity for tort claims like those asserted here. *See* Kazakhstan Mot. to Dismiss for Failure to State a Claim, at 9–10. In light of the significant ambiguities concerning waiver noted in the text, we need not rely on this point to decide this case, and hence need not consider Kazakhstan's representation regarding its legal system. We note, however, that World Wide did not dispute that representation. *See* World Wide Opp'n to Mot. to Dismiss.

17. *Cf. Hercules, Inc. v. United States,* 516 U.S. 417, 423, 116 S.Ct. 981, 985–86, 134 L.Ed.2d 47 (1995) (holding that the Tucker Act's waiver of sovereign immunity for contract claims does not extend to claims for contracts implied in law); *Watters,* slip op. at 5–7 (concluding that the WMATA Compact's waiver of immunity for contracts and torts does not extend to attorney's liens); *Doe v. Civiletti,*

635 F.2d 88, 94–95 (2d Cir.1980) (holding that the Tucker Act's waiver does not extend to statutory claims); *Rodenbur v. Kaufmann,* 320 F.2d 679, 683–84 (D.C.Cir.1963) (holding that a lease's waiver of trial by jury for "any matters whatsoever arising out of or in any way connected with this lease" did not extend to a tort claim).

18. In Count XI, World Wide asks the court to declare that it "had the right to market Kazakhstan uranium under the Suspension Agreement." Am. Compl. ¶ 161. Since World Wide obtained this right, if at all, under the Management Agreement, we construe Count XI as a request for a declaration that Kazakhstan breached that agreement by not granting World Wide an export license. To the extent that this relatively opaque count asserts other claims, Kazakhstan has not waived its immunity and the district court was without jurisdiction to entertain them.

816 (1990). When it does apply, the doctrine serves as " 'a rule of decision for the courts of this country,' " *id.* at 405, 110 S.Ct. at 704 (quoting *Ricaud v. American Metal Co.*, 246 U.S. 304, 310, 38 S.Ct. 312, 314, 62 L.Ed. 733 (1918)), which requires that, "in the process of deciding [a case], the acts of foreign sovereigns taken within their own jurisdictions shall be deemed valid," *id.* at 409, 110 S.Ct. at 707. Although the Supreme Court's description of the jurisprudential rationale for the doctrine has evolved over the years, the Court has most recently described it "as a consequence of domestic separation of powers, reflecting 'the strong sense of the Judicial Branch that its engagement in the task of passing on the validity of foreign acts of state may hinder' the conduct of foreign affairs." *Id.* at 404, 110 S.Ct. at 704 (quoting *Sabbatino*, 376 U.S. at 423, 84 S.Ct. at 938). The policies underlying the doctrine include "international comity, respect for the sovereignty of foreign nations on their own territory, and the avoidance of embarrassment to the Executive Branch in its conduct of foreign relations." *Id.* at 408, 110 S.Ct. at 706; *see id.* at 409, 110 S.Ct. at 706–07.

■ The gravamen of Count I is a claim that Kazakhstan breached the Management Agreement by "failing to issue an export license" to World Wide. Am. Compl. ¶ 93. Count XI seeks a declaratory judgment for breach of that agreement, and declares that "the denial of Plaintiff['] export license" is "the very heart of this matter." *Id.* at ¶ 157. We have no doubt that issuance of a license permitting the removal of uranium from Kazakhstan is a sovereign act. As we have previously held in the context of the FSIA, the "right to regulate imports and exports is a sover-

eign prerogative." *Millen Indus., Inc. v. Coordination Council for North Am. Affairs*, 855 F.2d 879, 885 (D.C.Cir.1988) (internal quotation marks and alteration omitted); *see Int'l Ass'n of Machinists v. OPEC*, 649 F.2d 1354, 1361 (9th Cir.1981) (affirming "the principle of supreme state sovereignty over natural resources" in applying the act of state doctrine); *cf. Rush–Presbyterian–St. Luke's Med. Ctr. v. Hellenic Republic*, 877 F.2d 574, 578 (7th Cir. 1989) (holding that "a contract whereby a foreign state grants a private party a license to exploit the state's natural resources is *not* a commercial activity [under the FSIA], since natural resources, to the extent they are 'affected with the public interest,' are goods in which only the sovereign may deal"); *MOL, Inc. v. Peoples Republic of Bangladesh*, 736 F.2d 1326, 1328 (9th Cir.1984) (holding that "licensing the exploitation of natural resources is a sovereign activity" under the FSIA).

Because the relief sought here would require us to question the "legality" of Kazakhstan's denial of the export license by ruling that denial a breach of contract,[19] the act of state doctrine applies. *Kirkpatrick*, 493 U.S. at 405, 110 S.Ct. at 704. Moreover, this is plainly a case in which the policies underlying the doctrine "justify its application," *id.* at 409, 110 S.Ct. at 706, since questioning the export control policies of a foreign state would both disrupt international comity and interfere with the conduct of foreign relations by the Executive Branch. *Cf. Clayco Petroleum Corp. v. Occidental Petroleum Corp.*, 712 F.2d 404, 408 (9th Cir.1983) ("[I]t is clear that judicial scrutiny of sovereign decisions allocating the benefits of oil development would embarrass the political branches of our government in the conduct of foreign

---

**19.** If anything, the specific relief sought in Count XI challenges the validity of Kazakhstan's actions even more directly, as it asks the court to declare that, despite the absence

of a license, World Wide had "the right to market Kazakhstan uranium." Am. Compl. ¶ 161.

policy."). Indeed, as the amended complaint reveals, both the export of Kazakhstan uranium to the United States and the use of licenses to control the quantity of such exports are the subjects of diplomatic efforts by the Executive. *See supra* note 3 and accompanying text. Accordingly, we conclude that the claims asserted in Counts I and XI must fail as a consequence of the act of state doctrine, and we therefore affirm the dismissal of those counts.

■■■■ Our analysis of Count III is the same. In that count, World Wide alleges that Kazakhstan breached the Pledge Agreement by "transferring the shares of TGK to Kazatomprom and by converting all pledged property, assets and interests for [its] own use." Am. Compl. ¶ 103. The amended complaint makes clear that this transfer and alleged conversion were accomplished pursuant to an official decree of the Republic of Kazakhstan. *Id.* ¶ 17; *see* Republic of Kazakhstan, Ministry of Finance, Resolution No. 317 (Oct. 2, 1997) (J.A. at 431). That kind of expropriation of property is the classic act of state addressed in the case law. And as the Supreme Court declared in *Sabbatino*, "the Judicial Branch will not examine the validity of a taking of property within its own territory by a foreign sovereign government." 376 U.S. at 428, 84 S.Ct. at 940; *see id.* at 430, 439, 84 S.Ct. at 941, 946; *Riggs Nat'l Corp. v. Comm'r of Internal Revenue Serv.*, 163 F.3d 1363, 1367 (D.C.Cir.1999) (citing *Sabbatino*, 376 U.S. at 403–04, 84 S.Ct. at 927); *Dayton v. Czechoslovak Socialist Republic*, 834 F.2d 203, 206 (D.C.Cir.1987); *Empresa Cubana Exportadora v. Lamborn & Co.*, 652 F.2d 231, 237–38 (2d Cir.1981); *Hunt v. Mobil Oil*, 550 F.2d 68, 73 (2d Cir.1977). Because Count III would require the court to undertake just such an examination, we affirm its dismissal.

At oral argument, World Wide acknowledged that both the denial of export licenses and the expropriation of property are sovereign acts under the act of state doctrine. It nonetheless contended that this case comes within an exception to that doctrine for "commercial activity." The existence of such an exception is an unsettled question that this court has never addressed.[20] Nor need we do so today.

■■■■ In claiming the benefit of the exception here, World Wide contends that its claims are not based on Kazakhstan's expropriation of its assets or on its denial of an export license, but rather on the following "purely" commercial conduct: 1) Kazakhstan's failure to repay loans and interest; 2) its refusal to enter into a joint venture with World Wide; and 3) its failure to pay management fees. World Wide Br. at 24, 26. However, the first of these claims is made only in Count II (breach of the Loan Agreement)—a count that we have already held must be dismissed for lack of subject matter jurisdiction. The second is made only in Count IV (breach of the Strategic Alliance Agreement), which does not name Kazakhstan as a defendant (and for which there was also no waiver of sovereign immunity). And the third is not made anywhere in the complaint—not even in what would seem the most likely place, Count I (breach of the Management Agreement). We, therefore, have no cause to address World Wide's contention that its claims fall within a commercial activity exception to the act of state doctrine.

**20.** *See Kirkpatrick*, 493 U.S. at 404–05, 110 S.Ct. at 704 (noting that "some Justices have suggested" a possible exception for commercial activity, but finding it unnecessary to consider the question to resolve the case); *Alfred Dunhill of London, Inc. v. Cuba*, 425 U.S. 682, 695, 96 S.Ct. 1854, 1861–62, 48 L.Ed.2d 301 (1976) (plurality opinion of White, J., adopting commercial activity exception).

In sum, we conclude that, although the district court had subject matter jurisdiction over three claims against Kazakhstan (Counts I, III, and XI), all three must nonetheless be dismissed under the act of state doctrine.

## IV

■ In addition to naming Kazakhstan as a defendant, most of the counts of the amended complaint also name Kazatomprom, a corporation wholly owned by Kazakhstan.[21] World Wide does not dispute that Kazatomprom is an instrumentality of Kazakhstan. World Wide Br. at xiii; see 28 U.S.C. § 1603(b) (providing that an "instrumentality of a foreign state" includes any corporation, "a majority of whose shares or other ownership interest is owned by a foreign state"). As a consequence, Kazatomprom is entitled to the immunity of the sovereign. See 28 U.S.C. §§ 1603(a), 1604; NYSA-ILA Pension Trust Fund v. Garuda Indonesia, 7 F.3d 35, 38 (2d Cir.1993) ("A defendant corporation that is owned entirely by a foreign state also is considered to be a distinct foreign state and immune from the jurisdiction of the federal courts."). Thus, for the same reasons discussed in Part III.A, the district court lacked jurisdiction to consider against Kazatomprom any of the counts of the amended complaint other than those alleging breaches of the only two agreements containing waivers of immunity: the Management and Pledge agreements. And because Kazatomprom is not a defendant in Count III (breach of

the Pledge Agreement), that leaves only Count I (breach of the Management Agreement) and Count XI (declaratory judgment, limited to breach of the Management Agreement).[22]

Our decision in Part III.B also effectively disposes of those two remaining counts. In that part, we held that because the gravamen of both Counts I and XI is an attack on the legality of Kazakhstan's refusal to grant World Wide an export license, those counts are barred—as against Kazakhstan—by the act of state doctrine. And since World Wide offers no reason to distinguish between Kazakhstan and Kazatomprom for purposes of the application of that doctrine,[23] our holding in Part III.B dispositively resolves the identical claims against Kazatomprom. This means that there is no substantial federal question as to World Wide's claims against Kazatomprom. And because in the absence of a substantial federal question the district court lacks jurisdiction, we may affirm the dismissal of these counts as well for lack of jurisdiction. See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 98–99, 118 S.Ct. 1003, 1014, 140 L.Ed.2d 210 (1998) (noting that the Court has regarded a judgment against a plaintiff, entered because the same issue had been "dispositively resolved" in a companion case, as "equivalent to a jurisdictional dismissal for failure to present a substantial federal question" (citing Norton v. Mathews, 427 U.S. 524, 530–31, 96 S.Ct. 2771, 2774–75, 49 L.Ed.2d 672 (1976))).

---

**21.** See supra note 4 for a list of the counts. Kazatomprom is not named in Count II (breach of the Loan Agreement) or Count III (breach of the Pledge Agreement). It is the sole defendant in Count IV (breach of the Strategic Alliance Agreement).

**22.** Although we did not directly address Count IV (breach of the Strategic Alliance Agreement) in Part III.A since Kazakhstan

was not named as a defendant in that count, the analysis of that Part applies because the Strategic Alliance Agreement does not contain a waiver of sovereign immunity. The district court therefore lacked subject matter jurisdiction over that count.

**23.** Nor does the amended complaint distinguish between the two in these counts.

## V .

Finally, we turn to the district court's decision to dismiss World Wide's claims against Nukem. The amended complaint names Nukem as a defendant in four counts: Count VIII (tortious interference), Count IX (civil conspiracy), Count X (violation of RICO), and Count XI (declaratory judgment). Because Nukem is neither a state nor the instrumentality of a state, it cannot assert sovereign immunity as a defense. Nor can we say, as we did regarding Kazatomprom, that our resolution of the act of state issues with respect to Kazakhstan removes any substantial federal question regarding the claims against Nukem, since we never reached the act of state question with respect to Counts VIII–XI, dismissing them instead for lack of subject matter jurisdiction.[24] We must therefore turn to the jurisdictional ground upon which the district court dismissed the counts against Nukem: personal jurisdiction.

Nukem is a New York corporation with its principal place of business in Connecticut. In the district court, World Wide asserted four alternative grounds for personal jurisdiction, all of which the court rejected: the transacting business clause of the District of Columbia's long-arm statute, D.C.Code § 13–423(a)(1); conspiracy jurisdiction; the nationwide service of process provision of RICO, 18 U.S.C. § 1965(d); and the nationwide service of process provision of the Clayton Act, 15 U.S.C. § 22. On appeal, World Wide argued only the first two grounds in its opening brief and has therefore waived reliance on the latter two. *See Students Against Genocide,* 257 F.3d at 834–35.

Under the District's long-arm statute, local courts may exercise personal jurisdiction over any person "as to a claim for relief arising from the person's ... transacting any business in the District of Columbia." D.C.Code § 13–423(a)(1). The statute makes clear that, where jurisdiction is predicated solely upon the long-arm statute, "only a claim for relief arising from acts enumerated in this section may be asserted." *Id.* § 13–423(b). Thus, personal jurisdiction under this theory "is limited to claims arising from the particular transaction of business" in the District. *AMAF Int'l Corp. v. Ralston Purina Co.,* 428 A.2d 849, 850 (D.C.1981); *see Naartex Consulting Corp. v. Watt,* 722 F.2d 779, 785–86 (D.C.Cir.1983). Similarly, to establish jurisdiction under a theory of civil conspiracy, the plaintiff must plead with particularity "overt acts within the forum taken in furtherance of the conspiracy." *Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan,* 115 F.3d 1020, 1031 (D.C.Cir. 1997) (internal quotations marks omitted).

The district court held, and World Wide does not dispute, that the only act that might satisfy these jurisdictional requirements was a meeting between Nukem officials and Kazakhstan's Ambassador, which World Wide alleges took place at Kazakhstan's embassy in Washington, D.C. 116 F.Supp.2d at 106–07; World Wide Br. at 45. World Wide alleges that these individuals met at the embassy "for the purpose of obtaining and/or confirming [Kazakhstan's] agreement to unlawfully breach its contract with Plaintiffs by denying their pending petition for a license to export" Kazakhstan uranium to the United States. Am. Compl. ¶ 6. As a result of some confusion in the parties' pleadings,

---

24. In Part III.B, we did conclude that Count XI is barred by the act of state doctrine to the extent that it reasserts Count I's claim of breach of the Management Agreement. But Nukem is not a defendant in Count I, and our act of state analysis did not address the allegation of Count XI that concerns Nukem— that it does not have an exclusive right to market Kazakhstan uranium in the United States. Am. Compl. ¶¶ 157–60.

the district court understood World Wide to allege that this meeting took place in December 1997. Since the court also understood from World Wide's allegations that all of its injuries occurred prior to that date, the court concluded that World Wide's claims could not have arisen from that meeting and that the meeting could not have furthered the conspiracy. The court therefore concluded that it had neither long-arm nor conspiracy jurisdiction over Nukem. 116 F.Supp.2d at 106, 108.

On appeal, the parties agree that there was a misunderstanding in the district court regarding the date upon which the embassy meeting allegedly occurred. Both World Wide and Nukem now agree that the relevant allegation—which we must take as true for purposes of this appeal—is that Nukem and Kazakhstan conspired together at a meeting that took place in the District of Columbia in late May 1997. *See* Am. Compl. ¶ 6; Nukem Br. at 11. The basis for the district court's dismissal therefore no longer suffices. Although Nukem contends that May 1997 was also too late to have contributed to the injuries claimed by World Wide, World Wide disputes that contention. Accordingly, we must remand the case to the district court to resolve the dispute over its jurisdiction.

## VI

For the foregoing reasons, we affirm, although in part for different reasons, the district court's dismissal of World Wide's complaint against Kazakhstan and Kazatomprom. The dismissal with respect to Nukem is remanded for further proceedings consistent with this opinion.

*Affirmed in part and remanded in part.*