# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued January 16, 2026       Decided February 13, 2026

No. 25-7003

MOHAMMAD HILMI NASSIF & PARTNERS, OWNER OF THE
TRADENAME TRUST WORLD WIDE CORP.,
APPELLANT

v.

REPUBLIC OF IRAQ AND MINISTRY OF INDUSTRY & MINERALS
OF THE REPUBLIC OF IRAQ,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:17-cv-02193)

———

*Rossana Arteaga-Gomez*, pro hac vice, argued the cause for appellant. On the briefs was *Peter Godwin*. *Edward D. Gehres* entered an appearance.

*Faisal Zubairi* argued the cause for appellees. With him on the brief was *Creighton R. Magid*. *Juan C. Basombrio* entered an appearance.

Before: MILLETT and RAO, *Circuit Judges*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the court filed by *Senior Circuit Judge* RANDOLPH.

RANDOLPH, *Senior Circuit Judge*: Mohammad Hilmi Nassif & Partners, a Jordanian business entity, commenced this action seeking recognition of a $53 million judgment entered by a Jordanian court against the Republic of Iraq and its Ministry of Industry and Minerals. The Foreign Sovereign Immunities Act "provides the sole basis for obtaining jurisdiction over a foreign state in the courts of this country." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 443 (1989). The district court, concluding that no FSIA exception to Iraq's sovereign immunity applied, dismissed the action for want of subject matter jurisdiction. We affirm.

**I**

In the early 1990s, Iraq was subject to comprehensive international sanctions following the Gulf War. During that period, Nassif supplied Iraq with humanitarian and commercial goods for which Iraq was unable to remit payment. To address this outstanding obligation, Iraq issued a written "Export Commitment Letter" in November 1995. The letter—an agreement—provided for settlement of the debt through the delivery to Nassif of specified quantities of sulfur and urea, with an estimated aggregate value of $53 million. The contemplated performance under the letter involved delivery of the sulfur and urea via the Iraq-Jordan border.

Nassif maintains that, at the time of the 1995 letter agreement, both parties understood that the only viable market for resale of the sulfur and urea in the quantities contemplated was in the United States. Nassif accordingly engaged in discussions with potential U.S. purchasers and, it alleges, prepared to arrange shipment through Jordan to a buyer in New

York. Such an anticipated downstream sale, however, was not reflected in the Export Commitment Letter itself.

Iraq failed to deliver the materials contemplated in the Export Commitment Letter.

Nassif engaged intermittently with Iraqi officials from 1997 to 2012 in an effort to secure satisfaction of the debt. According to declarations Nassif presented to the district court, a succession of senior Iraqi officials—including the Minister of Industry and Minerals, other high-ranking ministry personnel, and at one point the President of the Iraqi Governing Council—reviewed the 1995 Export Commitment Letter and, by word of mouth, affirmed that Iraq remained obligated under its terms. The declarations also recounted other oral statements attributed to these officials indicating that Iraq required a court order before funds could be released, but that Nassif could seek such an order in any forum and that "Iraq would not and could not dispute the lawsuit at all." Al-Tamimi Decl. ¶ 14.

In an apparent effort to obtain the legal documentation Iraq allegedly demanded, Nassif initiated litigation against Iraq in a Jordanian court. Iraq participated in that proceeding without invoking sovereign immunity and, in 2015, 20 years after the "Export Commitment Letter," the Jordanian court entered judgment in Nassif's favor in the amount of $53 million. The Jordanian Court of Cassation affirmed the judgment. When Nassif thereafter sought to enforce the judgment, however, the Jordanian Court of Appeal concluded that Iraq had not waived its sovereign immunity in the separate enforcement proceeding. To date, Iraq has not paid any portion of the Jordanian judgment.

In 2017, Nassif filed this action in the United States District Court for the District of Columbia, seeking recognition of the

Jordanian judgment. Iraq moved to dismiss Nassif's complaint, asserting its sovereign immunity under the FSIA. The district court agreed with Iraq and dismissed the case for lack of jurisdiction. We review that sovereign immunity determination de novo. *See Odhiambo v. Republic of Kenya*, 764 F.3d 31, 35 (D.C. Cir. 2014).

**II**

Nassif invokes two sovereign immunity exceptions to the FSIA: the explicit waiver exception and the commercial activity exception. We consider each in turn and conclude that neither applies here.

**A**

Nassif first contends that Iraq "waived its immunity . . . explicitly" within the meaning of 28 U.S.C. § 1605(a)(1).[1] Claims of explicit waiver are "narrowly construed in favor of the sovereign." *World Wide Minerals, Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154, 1162 (D.C. Cir. 2002) (internal quotation marks omitted). To be effective, a waiver therefore "must give a clear, complete, unambiguous, and

---

[1] The FSIA also recognizes that a foreign state may waive its immunity "by implication." 28 U.S.C. § 1605(a)(1). Nassif, however, disclaims reliance on any implicit-waiver theory—and prudently so. Thus far, this court has recognized "only three circumstances" in which a foreign sovereign may be deemed to have implicitly waived immunity, and each is plainly inapplicable here. *Ivanenko v. Yanukovich*, 995 F.3d 232, 239 (D.C. Cir. 2021); *see also World Wide Minerals, Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154, 1161 n.11 (D.C. Cir. 2002) (noting that courts are "reluctant" to recognize an implicit waiver in other circumstances).

unmistakable manifestation of the sovereign's intent to waive its immunity." *Id.* (quoting *Aquamar S.A. v. Del Monte Fresh Produce N.A., Inc.*, 179 F.3d 1279, 1292 (11th Cir. 1999)). It is not enough that a possible construction of the foreign state's words may constitute a waiver. *Cf. Bainbridge Fund Ltd. v. Republic of Argentina*, 102 F.4th 464, 471 (D.C. Cir. 2024).

Measured against this exacting standard, the statements on which Nassif relies fall short.

Several of the remarks attributed to Iraqi officials are readily susceptible to an interpretation that does not address immunity at all. Minister Al-Ani's assurance that Nassif "had the right to sue Iraq anywhere" and that "Iraq would not object to being sued anywhere" can be read as solely an acknowledgment that the Export Commitment Letter imposed no venue restriction and that Iraq regarded its obligations under the letter agreement as binding on the merits. M. Nassif Decl. ¶ 14. The statements of Ahmed Chalabi, then President of the Iraqi Governing Council, admit of the same understanding. Chalabi confirmed that the letter agreement was an "unconditional undertaking and that it was a valid commercial obligation of the Republic of Iraq." Abu-Hijleh Decl. ¶ 25.

Later statements attributed to Yakoub Yousef Shonia, then Economic Counsel for the Ministry of Industry and Minerals, as well as Ministers Hariri and Karbouli, come closer to the line Nassif presses, yet stop well short of crossing it. Shonia assured Nassif that it could sue "anywhere to enforce its rights" and that Iraq would have "no defense" to such a lawsuit. Al-Tamimi Decl. ¶¶ 7-8. Hariri similarly told Nassif to "sue Iraq and the Ministry anywhere it wants" and gave assurances that "when [Nassif] had the judgment, Iraq would pay." Al-Tamimi *Id.* ¶ 11. And Karbouli echoed this theme, stating that Nassif "may sue Iraq and the Ministry anywhere it would like, that Iraq would

not and could not dispute the lawsuit at all and then, when [Nassif] obtained the court order, [it] should present the court order to Iraq and then Iraq would release the funds." *Id.* ¶ 14. Read most charitably to Nassif, these assurances suggest an intention to facilitate recovery through litigation and thus may gesture toward waiver. Yet even this language falls short of the clarity the FSIA requires. Narrowly construed—as the statute requires—these statements remain consistent with a recognition of liability and an absence of contractual venue restrictions, coupled with a promise to honor a judgment. *World Wide Minerals*, 296 F.3d at 1162 ("[E]xplicit waivers . . . are not enlarged 'beyond what the language requires.'" (quoting *Library of Cong. v. Shaw*, 478 U.S. 310, 318 (1986))). They do not unambiguously manifest a relinquishment of immunity.

Nassif characterizes this conclusion that the cited statements fall short of an explicit waiver as an improper insistence on "magic words" untethered to the statutory text. *See* Nassif Br. 22-28; Nassif Reply Br. 5-6. It is not. The statute does not prescribe any talismanic formula. But whatever language is used must speak plainly to the waiver of immunity. *World Wide Minerals*, 296 F.3d at 1162. Where courts have found an explicit waiver, the sovereign's statements have addressed immunity in terms—using words such as "waive" and "immunity"—that unmistakably convey consent to jurisdiction. *See Mohammad Hilmi Nassif & Partners v. Republic of Iraq*, 759 F. Supp. 3d 30, 41 n.4 (D.D.C. 2024) (collecting cases identifying waiver language that courts have deemed to effect an explicit waiver); *see also id.* at 42 n.5 (collecting cases in which courts declined to find waiver because the waiver language did not expressly address immunity). That stands in sharp contrast to the statements Nassif invokes here, which neither employ such language nor otherwise confront the surrender of jurisdictional protection. Recognizing that a waiver is not explicit when it "contains no mention of a waiver of immunity to suit in United

States courts" does not impose a magic-words requirement; it simply gives effect to the statute's demand for clarity. *Amerada Hess*, 488 U.S. at 442; *see also Lac du Flambeau Band of Lake Superior Chippewa Indians v. Coughlin*, 599 U.S. 382, 388 (2023) (explaining that a clear-statement rule is consistent with the absence of a magic-words requirement).

The form of the evidence on which Nassif relies only compounds the ambiguity of the Iraqi officials' statements. The oral statements appear as paraphrases and summaries supplied years—if not decades—later in declarations by witnesses to whom the statements were made. Iraq does not challenge the declarants' descriptions, and we have no occasion to question their accuracy. Yet the absence of the precise language and surrounding context in which the statements were made impedes the searching inquiry the FSIA demands. *See World Wide Minerals*, 296 F.3d at 1162. We will assume *arguendo* that an explicit waiver need not be in writing and that an oral waiver could suffice if expressed with the requisite clarity—particularly if preserved in transcripts or recordings binding on the parties. When the purported waiver is filtered through retrospective summaries, however, it is difficult to conceive how it can satisfy the FSIA's demand for unambiguous language. That demand presumes access to the language itself.

In short, none of the individual statements here unambiguously manifests a waiver of immunity. Nassif therefore urges us to consider the statements collectively and infer from their combined effect what none expresses on its own. But a waiver that must be assembled from multiple ambiguous statements is not the "clear, complete, unambiguous, and unmistakable manifestation" of waiver that the statute requires. *Id.* (quoting *Aquamar*, 179 F.3d at 1292).

8

**B**

Nassif's second ground for finding a waiver of Iraq's immunity rests on the FSIA's commercial activity exception. This permits the exercise of jurisdiction over a foreign sovereign even in the absence of an explicit waiver of immunity.[2] The exception applies when

> the action is based [1] upon a commercial activity carried on in the United States by the foreign state; or [2] upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or [3] upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2). Nassif relies solely on the third clause, the first two being plainly inapplicable.

Our analysis begins with the statutory phrase that anchors the exception: "based upon." The Supreme Court has held that, for purposes of the first clause of the commercial activity exception, an action is "'based upon' . . . those elements of a claim that, if proven, would entitle a plaintiff to relief under [its] theory of the case." *Saudi Arabia v. Nelson*, 507 U.S. 349, 357 (1993). This court has applied this same reading to the second

---

[2] We note that some discussion at oral argument was directed at whether the statutory provision for exceptions to enforcement immunity, 28 U.S.C. § 1610, governs actions seeking recognition of foreign judgments, or whether such actions are instead governed by the provisions of 28 U.S.C. § 1605, as the parties assumed. § 1610 is limited to proceedings "upon a judgment entered by a court of the United States or of a State." An action to recognize a foreign-country judgment, however, arises before any such domestic judgment exists. Such an action thus lies beyond the scope of § 1610.

clause of the exception, *see Odhiambo*, 764 F.3d at 37, and we now hold that the phrase "based upon" bears the same meaning in the third. Although the third clause differs from the first two in certain textual respects, those differences do not justify attributing divergent meanings to language that is identical across each clause. To the contrary, "there is a presumption that a given term is used to mean the same thing throughout a statute, a presumption surely at its most vigorous when a term is repeated within a given sentence." *Brown v. Gardner*, 513 U.S. 115, 118 (1994) (citation omitted); *see also Reno v. Bossier Parish School Board*, 528 U.S. 320, 329 (2000) ("[W]e refuse to adopt a construction that would attribute different meanings to the same phrase in the same sentence, depending on which object it is modifying."). Nothing in the text, structure, or purpose of § 1605(a)(2) overcomes that presumption here.

Accordingly, in assessing the applicability of the third clause, our inquiry focuses on whether the conduct that forms the gravamen of Nassif's claim "cause[d] a direct effect in the United States." 28 U.S.C. § 1605(a)(2); *see OBB Personenverkehr AG v. Sachs*, 577 U.S. 27, 35 (2015) ("*Nelson* . . . teaches that an action is 'based upon' the 'particular conduct' that constitutes the 'gravamen' of the suit.").

The parties disagree over how that gravamen should be defined. Nassif urges a capacious view, extending to the underlying commercial conduct that produced the Jordanian judgment—namely, Iraq's nonperformance under the Export Commitment Letter. Nassif Br. 34-35. Iraq, by contrast, contends that the relevant conduct is confined to the elements of the present action seeking recognition of that judgment. Iraq Br. 42. To repeat, the Supreme Court in *Nelson* stated that courts should focus on "those elements of a claim that, if proven, would entitle a plaintiff to relief under [its] theory of the case."

507 U.S. at 357. This statement appears to lend support to Iraq's position. Yet the Court later warned against "overreading" that formulation and instructed courts to "zero[] in on the core" of the action and identify the "sovereign acts that actually injured" the plaintiff. *Sachs*, 577 U.S. at 34-35.

Nassif's claim fails under either characterization. Nassif concedes that if the action is "based upon" the Jordanian judgment alone, the commercial activity exception would not apply. *See Nassif*, 759 F. Supp. 3d at 48 (noting Nassif's concession); Nassif Br. 29-36 (making no argument on this point). But the same conclusion follows even if we look past the judgment to the underlying commercial conduct. Iraq's contractual obligations were confined to the delivery of sulfur and urea via the Iraq-Jordan border. The letter agreement was made abroad and required no performance in the United States. That fact is dispositive. A contractual breach has a "direct effect" in the United States only when the contract establishes or necessarily contemplates this country as the place of performance. *See Odhiambo*, 764 F.3d at 38 ("[B]reaching a contract that establishes a different or unspecified place of performance can affect the United States only *indirectly*, as the result of some intervening event . . ..").

Nassif nevertheless contends that the parties contemplated the subsequent sale of the sulfur and urea to a buyer in New York and that Iraq's nonperformance therefore produced a "direct effect" in the United States by derailing that transaction. Nassif Br. 33-36; Nassif Reply Br. 22-25. But the expectation of that downstream sale to a United States buyer was not memorialized in the letter agreement and imposed no obligation on Iraq. A144. Any consequences felt in the United States thus did not flow directly from Iraq's breach. They arose instead from an intervening event—Nassif's independent decision to structure a downstream resale transaction with the New York

buyer. *See Cruise Connections Charter Mgmt. 1, LP v. Att'y Gen. of Canada*, 600 F.3d 661, 664 (D.C. Cir. 2010) ("A direct effect is one which has no intervening element, but, rather, flows in a straight line without deviation or interruption." (cleaned up)); *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 618 (1992) ("An effect is 'direct' if it follows as an immediate consequence of the defendant's activity." (cleaned up)). Because Iraq's conduct produced no "direct effect" in the United States, the commercial activity exception does not permit Nassif's suit.

\* \* \*

Because neither exception to sovereign immunity on which Nassif relies applies here, the claim is foreclosed. We therefore affirm the judgment of the district court.

*So ordered.*